TURNER CONSTRUCTION COMPANY,
Plaintiff-Appellant,

v.

UNITED STATES of America,
Defendant-Appellee.

Edmund A. PRENTIS, Lazarus White, Charles B. Spencer, Inc., and Spencer, White & Prentis, Inc., Plaintiffs-Appellants,

v.

UNITED STATES of America,
Defendant-Appellee.

Nos. 284, 285, Dockets 29323, 29324.

United States Court of Appeals
Second Circuit.

Argued March 22, 1966.

Decided July 26, 1966.

526

Irwin B. Robins, Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty., for S. D. New York, and Grant B. Hering, Asst. U. S. Atty., New York City, on the brief), for defendant-appellee.

Richard H. Tunstead, New York City, Edmund A. Prentis, Lazarus White, Charles B. Spencer, Inc. and Spencer, White & Prentis, Inc., Austin & Diamond, New York City (Spencer & Tunstead, New York City, on the brief), for plaintiffs-appellants.

Before LUMBARD, Chief Judge, and WATERMAN and MOORE, Circuit Judges.

LUMBARD, Chief Judge:

Two taxpayers, Turner Construction Company (Turner) and Edmund A. Prentis, Lazarus White, Charles B. Spencer, Inc.,[1] appeal from two judgments of the United States District Court for the Southern District of New York. The cases were tried together because they contained a common issue of fact and law. Since that issue is contested here by both taxpayers, the appeals have also been consolidated. Each taxpayer also presses an issue applicable only to it.

The appeals present three questions. First, whether the useful life for depreciation purposes of certain Turner warehouse buildings was 25 years or 33⅓ years. Second, whether each taxpayer may claim a loss in its 1951 tax year on the "sale" of stock in a joint venture corporation. Third, whether Spencer properly assigned a stepped-up basis to machinery and equipment received from a predecessor corporation in 1952. A fourth issue involves whether Spencer should have been permitted to amend its complaint after the trial court's opinions were announced so as to press a new theory with respect to issue III. We find against the taxpayers on issues I and II and we affirm those portions of the lower court's orders. On issue III we reverse and remand for further proceedings. For this reason, we do not decide the amendment question.

The three issues are essentially unrelated and will be treated independently. The parties stipulated many of the relevant facts. A three-day trial without a jury developed additional facts. The cases are governed by the provisions of the Internal Revenue Code of 1939 (hereinafter referred to by section numbers only).

I. *Useful Life of the Hackensack Buildings*

Turner contends that the district court erred in upholding the Commissioner's determination that the useful life for depreciation purposes of three warehouse buildings in Hackensack, New Jersey, was 33⅓ years instead of 25 years, as Turner had claimed in its tax returns. Turner constructed these buildings in 1952 when it shifted its repair and storage facilities from Maspeth, Long Island, to New Jersey. The State of New Jersey's Highway Department condemned the buildings after the tax years in question.

Since the stipulation contained only a technical description of the buildings, resolution of this issue turned on the oral testimony. Francis B. Warren, Turner's executive vice president and treasurer, testified that the buildings were open air storage and repair facilities made from light, prefabricated materials, that they received rough treatment from the company's heavy construction equipment, and that 25 years was a reasonable estimate of their useful lives. The government countered with testimony by the revenue agent who had examined these buildings —a graduate engineer who had made similar estimates for the Commissioner since 1946. He described the buildings and explained his reasons for concluding that these structures had a useful life of 40 years.

After reviewing this conflicting evidence, Judge Levet concluded that the taxpayer had failed to meet its burden of proving that the Commissioner's estimate—the compromise figure of 33⅓ years—was incorrect. Turner refers us to many cases which have set the useful lives of warehouse buildings at 25 years or less, and urges us to reverse the decision of the trial judge. But the question here is the useful life of these particular structures. The record reveals that the Hackensack buildings replaced Maspeth buildings having an admitted useful life of 50–60 years. Under these circumstances, we find no error in the lower court's conclusion that neither side had affirmatively proved its position. In

[1]. This company will be referred to as Spencer in Parts I and II of this opinion. In fact, there are two "Spencer" companies, both of which are appellants here. They will be properly differentiated in Parts III and IV of the opinion.

such a case, the taxpayer, who has the burden of proof, cannot prevail.

## II.  *River Construction Corporation Transaction*

■ Both Turner and Spencer assail the district court's holding that the Commissioner properly disallowed losses claimed by the taxpayers on the "sale" of their stock in the River Construction Corporation (River) in June of 1951. Here a complex factual situation raises a fundamental tax question in a novel form.

Early in 1947, six construction companies, including Turner and Spencer, agreed to undertake a joint venture to secure a government contract for the construction of Lock No. 27, Chain of Rocks Canal, on the Mississippi River near Granite City, Illinois. The companies incorporated River as a Delaware corporation on April 29, 1947. On May 1, the six signed an agreement which fixed their respective interests in River,[2] and defined their rights and obligations as shareholders. Significantly, the agreement provided that none of the six would sell its River shares without unanimous approval of all; that such a sale would not relieve the seller of any obligations under the contract; and that each of the six would hold harmless, up to a designated amount, any surety which executed a bid bond on the lock project.

The six participants eventually agreed on a bid for the project which was submitted by River. On the basis of this bid, and the surety bond of the United States Fidelity and Guaranty Company, River was awarded the construction contract and, shortly after work began, was awarded a companion contract to install a 54″ pipe under the Chain of Rocks Canal.

By 1950, due principally to unforeseen weather and labor conditions, it was apparent that River would incur substantial losses on the contracts. In the fall of 1950, the Winston Brothers and Al Johnson companies announced their desire to sell out so as to realize in that tax year a capital loss on the River venture. The other participants refused to permit a sale to third parties, but it was agreed that each of these two could return its shares to River in exchange for $9,000 in cash and a non-assignable, non-interest-bearing note in the amount of $171,000.[3]

By the middle of 1951, River's construction work on the two contracts was over 95% completed. However, the amount of the ultimate loss was still unpredictable because River had contingent claims against the government which might take years of litigation and negotiation. At this point, the four remaining shareholders decided that River should have only a single owner during this "liquidation" period.

To reduce River from four shareholders to one posed significant problems. None of the participants wanted River

---

2.  The original stock subscriptions in River were as follows:

| | | | |
|---|---|---|---|
| 20% | Raymond Concrete Pile Company | 5000 shs. at $100 | $500,000 |
| 20% | Spencer, White & Prentis, Inc. | 5000 shs. at $100 | $500,000 |
| 20% | Turner Construction Company | 5000 shs. at $100 | $500,000 |
| 20% | Winston Bros. Company | 5000 shs. at $100 | $500,000 |
| 10% | Al Johnson Construction Company | 2500 shs. at $100 | $250,000 |
| 10% | Morrison-Knudsen Company, Inc. | 2500 shs. at $100 | $250,000 |

---

3.  Although the consideration was different, the terms of these notes were identical to those contained in the Turner and Spencer notes, described infra.

stock sold to outside interests. In addition, each was contractually bound to the surety company to meet its share of River's losses. Finally, though they wanted only one shareholder, they agreed to share the ultimate burden of River's losses equally.

These considerations were met in the following manner. Morrison-Knudsen Company agreed to pay $125,000 into the corporate surplus of River. Turner, Spencer and Raymond Concrete Pile Company each agreed to transfer its shares to River in exchange for $11,000 in cash and a non-assignable, non-interest-bearing note in the amount of $209,000. Each of the three notes was subordinated to claims of the surety, and each contained the following provision:

3. When and if the aforementioned contract is completed and upon closing of accounts of said contract it shall appear that such stock, exclusive of good will, tax credits and other similar intangibles, is worth less than $220,000 [the total purchase price to Turner and Spencer], based on its original capitalization less losses on said lock contracts and pipe line contract, plus $125,000 [the amount of Morrison-Knudsen's contribution ], then and *in that event this note shall be reduced by a sum represented by the difference between its then so determined true worth and $220,000.* (Emphasis added.)

The $220,000 purchase price amounted to $44 per share. This figure allegedly was determined by rough calculations based on River's current balance sheet and its anticipated total loss. When final payment on the notes was finally made to Turner and Spencer in 1957, it was found that all payments had totaled only $118,-134.27, or $23.63 per share, to each company. The taxpayers vigorously contend that $44 per share was nevertheless a fair

and reasonable estimate of River's value in 1951, and that only a disappointing realization on the contingent claims against the government prevented a larger recovery. But Judge Levet pointed out in his opinion evident miscalculations which produced a liberal estimate of River's worth. Given taxpayers' disproportionately low recovery on the notes, we infer that $44 was agreed upon because it was a "safe" price. In other words, it presented a maximum amount per share which the parties anticipated in 1951 could finally be realized by River on the project.

These transactions provided a number of possible benefits to the participants. Morrison-Knudsen, by becoming sole parent of River, no doubt hoped to utilize more fully River's large net operating loss carryover. Turner and Spencer, by exchanging their River stock for cash and a note, not only profited from the $125,000 paid by Morrison-Knudsen into River but also hoped to realize some of their loss on the River venture so as to offset 1951 income.[4] On the other hand, the ultimate risk of loss remained evenly distributed among all six of the original shareholders, and the surety company retained satisfactory protection.

This appeal raises only the question whether Turner and Spencer properly declared as a loss in 1951 the difference between the $220,000 "paid" for their stock and their original investments of $500,-000. The government argues that the loss was properly disallowed for four reasons: (1) the sales were fictitious and therefore no losses were realized in 1951; (2) the transactions were not adequately closed and completed in 1951; (3) the amounts of the losses were not sufficiently ascertainable in 1951; and (4) taxpayers' "sales" to River were in fact parts of a tax-free recapitalization. Judge Levet agreed with the first three

---

4. For example, Spencer's River loss if recognized in 1951 would have coincided nicely with the capital gain it declared as a result of the transaction described in Part III of this opinion. Of course, the claims do not fail merely because

they reflected a certain amount of tax planning. But neither can we accept the insistent claims by taxpayers that tax savings played *no* role in motivating their unusual transactions.

contentions and disallowed the losses in the 1951 tax years of Turner and Spencer. We agree that in 1951 the losses were neither sufficiently ascertainable nor properly evidenced by a closed transaction.

■ Under Section 23(f), now Section 165 of the Internal Revenue Code of 1954, a deduction was allowed "in the case of a corporation, [for] losses sustained during the taxable year and not compensated for by insurance or otherwise." For help in resolving a specific problem, we look to Treasury Regulation 111, § 29.23(e)-1 (1939), which provides that to qualify as a deduction a loss "must be evidenced by closed and completed transactions, fixed by identifiable events, bona fide and actually sustained during the taxable period for which allowed." In accordance with these principles, Turner and Spencer must each establish that its loss was "realized * * * by a sale," Weiss v. Wiener, 279 U.S. 333, 335, 49 S. Ct. 337, 73 L.Ed. 720 (1929); that the sale was a completed transaction in 1951, see Burnet v. Logan, 283 U.S. 404, 413, 51 S.Ct. 550, 75 L.Ed. 1143 (1931); and that the exact amount of the loss was in 1951 "so reasonably certain in fact and ascertainable in amount as to justify [its] deduction" at that time, Lucas v. American Code Co., 280 U.S. 445, 449, 50 S.Ct. 202, 203, 74 L.Ed. 538 (1930).

Though River's construction work on the project was nearly completed in 1951, the exact loss which its shareholders would realize on their investments could not then be determined. Therefore, had the six shareholders held their stock from 1951 until the final winding up of the project in 1957, they could not have deducted any portion of the eventual loss before 1957, even if the corporation had made distributions in partial liquidation during that period. As the Court of

Claims stated in Dresser v. United States, 55 F.2d 499, 511–512, cert. denied, 287 U.S. 635, 53 S.Ct. 85, 77 L.Ed. 550 (1932):

> It often happens, as here, that the liquidation of a corporation extends over a period of years and a decision that a loss may be taken upon the basis of a valuation of the unliquidated assets and an estimate of the remaining liabilities and expenses would enable the taxing authorities to place the loss in a taxable year in which the taxpayer might have a very small income and would enable the taxpayer to select a taxable year in which to take the loss in which he might have a large income and thereby obtain a greater benefit from the loss. * * * A stock loss is no different from a loss on any other property, and if a taxpayer acquires property at a certain cost which has not been disposed of he may not take a deduction from gross income as a loss of any amount merely because it may appear that when the property is finally disposed of he will receive less than what he paid for it.[5]

■ The situation here is somewhat different from that in *Dresser* because five of the six River shareholders returned their stock to the corporation in exchange for cash and notes of indefinite value and duration. Taxpayers contend that these transactions, unlike distributions in partial liquidation, were a realization of their losses in 1951. Of course, when stock is actually sold by a shareholder for a loss, either to a third party or to the corporation itself, that loss is immediately allowed so long as the consideration received is reasonably ascertainable in amount. Cf. Commissioner v. Winthrop, 98 F.2d 74 (2 Cir. 1938). Thus, in 1951, Turner and Spencer could

---

5. In the case of a losing corporation like River, a series of such distributions would normally reduce the basis of the recipient's stock. See §§ 115(c), 113(b) (1) (D). However, the court in *Dresser* expressly recognized that a loss may be taken if it is manifest to a shareholder that he will receive nothing more from a liquidation and hence that his stock is worthless. See United States v. S. S. White Dental Mfg. Co., 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120 (1927). But the cases cited by the taxpayers to this effect are not relevant here because the River stock and notes at all times had some value.

have realized part of their eventual losses by selling outright a part of their stock, or all of their losses by selling all of their stock, for cash.

But neither of these alternatives was adopted, and with good reason. Since Turner and Spencer wished to relinquish stock ownership but not the ultimate risk of loss, they transferred all of their stock in exchange for cash and carefully tailored notes. Because of paragraph 3 of the notes, p. 528 supra, the holders were entitled to no greater portion of future distributions of River assets than Morrison-Knudsen, the sole remaining shareholder. While the taxpayers did surrender in 1951 their rights as shareholders to participate in managing the business, from a financial standpoint the notes represented the same stake in River as their stock had represented. Given the safety of the $44 price and the nature of the notes received, these transactions had no more financial significance than an accounting entry debiting $280,000 to a "Loss on River Investment" account and crediting an equal amount to whatever investment account taxpayers used to signify their River venture. While such an interim entry might well reflect sound accounting practice, the tax laws allow losses to shareholders only for closed and completed stock sales for reasons made clear in the *Dresser* opinion, supra.

The taxpayer's main argument is that, because of the terms of the notes, their minimum ultimate losses—i. e., the difference between $44 per share and their original investments—were unalterably fixed in 1951 and that the transactions were therefore closed to that extent. This argument, like the transactions in question, is ingenious. The difficulty with it is that the precise amount of con-

sideration received in the 1951 transactions was not reasonably ascertainable in 1951 because the notes were of indefinite value. This indefiniteness was an intentional feature of the taxpayers' transactions, and we cannot ignore it merely because the maximum value of the notes, $209,000 each, was fixed. It was this indefiniteness that distinguished the transactions from completed sales of the stock. If they are nonetheless treated as sales, as appellants urge, shareholders could easily split anticipated stock losses in substantially the same way as that condemned in *Dresser*. Under these circumstances, we do not think that the losses were "actually sustained" in the 1951 tax year. Treas.Reg. 111, § 29.23 (e)–1 (1939). We hold that they may not be allowed even in part in that year.

In view of the above, we need not reach the government's alternative contention that the notes received by Turner and Spencer from River were "securities" and hence that the transactions were part of a tax free recapitalization in which no loss is recognized under Section 112(b) (3), 112(e), and 112(g) (1) (E).

### III. *Basis for Depreciation of Machinery*

Spencer appeals from the district court's decision accepting the basis for depreciation set by the Commissioner for machinery transferred from Spencer's predecessor in 1952. The Commissioner disallowed $30,442.46 in depreciation for the tax year ending June 30, 1953, on the ground that Spencer was limited to the adjusted basis of the machinery in its predecessor's hands ($215,304.80) because the machinery had been transferred as part of a tax free transaction under Section 112(b) (4) and (b) (5).[6] Spen-

---

6. All relevant provisions of the 1939 Code will be quoted at this point for convenience:

   § 112(b) (4): "No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization."

§ 112(b) (5): "No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock

cer contends that the proper basis is its cost ($381,112.83) and that the depreciation was improperly disallowed. A detailed statement of facts is necessary to show why we disagree with the district court.

The predecessor had been formed in 1919 under the name of Spencer, White & Prentis, Inc. (Old Spencer) to engage in construction and civil engineering. By 1952, the founders of this successful business wished to allow their younger associates to acquire the business and its name, but to provide the "new blood" with a smaller stake (lower capitalization) for the risky construction business than that possessed by Old Spencer.

In June 1952 Old Spencer "reorganized." A new company having the name Spencer, White & Prentis, Inc. (New Spencer), was formed with the following authorized capital structure:

| | |
|---|---|
| Authorized Capital .......$1,100,000 | |
| 4% cumulative participating (to the extent of 15% of net profits after income taxes) preferred stock—100,000 shares per value $10......... | 1,000,000 |
| Common stock Class A— 300 shares per value $100 .............. | 30,000 |
| Common stock Class B— 700 shares per value $100 .............. | 70,000 |

At the same time, Old Spencer changed its name to Edmund A. Prentis, Lazarus White, Charles B. Spencer, Inc.

and securities received by each is substantially in proportion to his interest in the property prior to the exchange."

§ 112(c) (1): "If an exchange would be within the provisions of subsection (b) * * * (5) * * * of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph * * * to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property."

§ 112(d): "If an exchange would be within the provisions of subsection (b) (4) * * * of this section if it were not for the fact that the property received in exchange consists not only of stock or securities permitted by such paragraph to be received without the recognition of gain, but also of other property or money, then * * * (2) If the corporation receiving such other property or money does not distribute it in pursuance of the plan of reorganization, the gain, if any, to the corporation shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property so received, which is not so distributed."

§ 112(g): "As used in this section * * * and in section 113 * * * (1) the term 'reorganization' means * * * (C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of substantially all the properties of another corporation * * * or (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred * * *"

§ 112(h): "As used in this section the term 'control' means the ownership of stock possessing at least 80 per centum of the total combined voting power of all classes of stock entitled to vote and at least 80 per centum of the total number of shares of all other classes of stock of the corporation."

§ 113(a): "The basis of property shall be the cost of such property; except that * * *

(7) If the property was acquired * * * (B) in a taxable year beginning after December 31, 1935, by a corporation in connection with a reorganization, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer * * *

(8) If the property was acquired after December 31, 1920, by a corporation— (A) by the issuance of its stock or securities in connection with a transaction described in section 112(b) (5) * * * then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer * * *"

(26 U.S.C.A.1939 Internal Revenue Code, as amended.)

On June 16, 1952, New Spencer transferred 16,020 shares of preferred stock to Old Spencer in exchange for $160,200 cash; 300 shares of New Spencer's Class A common were also transferred for $14,802.18 cash, $5,800 in furniture and fixtures, and $9,397.82 in prepaid insurance. On June 26, New Spencer transferred $50,000 in cash and its promissory note for $331,112.83 to Old Spencer in exchange for the old company's plant and equipment. These assets had been valued by a group of the younger employees, and Judge Levet found that this valuation was fair. The transaction took the form of a sale conditioned upon payment of the six-month interest-bearing promissory note.[7] The net effect of these transactions (including those referred to in footnote 7 supra) was as follows:

### Old Spencer Received

| | |
|---|---|
| 16,020 shares preferred stock | $160,200 |
| 300 shares Class A common stock | 30,000 |
| Two promissory notes | 407,862.83 |
| | $598,062.83 |

### New Spencer Received

| | |
|---|---|
| Furniture, fixtures and pre-paid insurance | $ 15,197.82 |
| Plant and equipment | 381,112.83 |
| 250 shares, Drilled-In-Caisson stock | 101,750 |
| Cash | 100,002.18 |
| | $598,062.83 |

The promissory note was paid on January 7, 1953.[8] On the next day, 620 shares of New Spencer's Class B common were issued to ten employees who had also worked for Old Spencer. (By March 1, 1954, the remaining 80 authorized Class B shares had been issued to three other employees.)

After the "reorganization," New Spencer took up the jobs in progress and the construction business of the old company, and the new blood was gradually worked into the top levels of management. Old Spencer remained in existence, but it did no construction work. It retained a valuable New York state license to practice engineering, and its business was shifted to engineering consulting under this license. Such consulting, which New Spencer is not licensed to undertake, is practiced by Old Spencer today.

The two companies filed a consolidated tax return for the taxable year ending June 30, 1953. Claiming that Old Spencer's sale of the machinery was a taxable transaction separate from the formation of New Spencer, the group paid a capital gain for Old Spencer on this sale, and based New Spencer's depreciation deduction for the machinery upon a stepped-up basis of $381,112.83.

The Commissioner disallowed part of New Spencer's depreciation on the ground that the various transactions of June 1952 were part of a unified plan of reorganization; that the entire plan, and hence each of its steps, was tax free un-

---

7. Judge Levet found that 250 shares of Drilled-In-Caisson Corporation, a 50% owned subsidiary, were transferred to New Spencer as part of this transaction. Plaintiffs' Exhibit 31, the minutes of a special meeting of Old Spencer, indicates that this stock was transferred independently for $25,000 in cash and a promissory note for $76,750. Although the matter was not of importance to Judge Levet, given his solution of the issues presented, our position may require resolution of this inconsistency on remand in order to determine the consideration paid for the depreciable machinery in question. For our discussion, we assume Exhibit 31 is accurate.

8. Judge Levet found that interest was not paid as the note required, relying on Exhibit 37, a check for the face amount of the note from New Spencer to Old Spencer dated January 7. On appeal, taxpayers contend that interest was paid, and they point to oral testimony to that effect in the record. Although this conflict seems of little importance, a more significant question is raised by Exhibit 26 (New Spencer's "Stock Issues" list), which reveals that New Spencer issued 35,000 additional shares of preferred stock to Old Spencer on January 7, the same day the note was repaid. See 535 infra.

der Sections 112(b) (4) and (b) (5); and that New Spencer therefore had a carryover basis on the machinery under Section 113(a) (7) or (a) (8).

Judge Levet agreed with the Commissioner. He found that Old Spencer wholly owned New Spencer up until January 1953 and that the old company remained in "control" through all of 1953, see Section 112(h). He then concluded that the "intent of the parties, timing, ultimate result and mutual interdependence of the transactions" of June 1952 were such that the machinery sale was a step in a unified reorganization of Old Spencer qualifying under Section 112(b) (4) or a unified incorporation of New Spencer qualifying under Section 112(b) (5). Finally, he held that the six months promissory note was a "security" within the meaning of Sections 112(b) (4) and (b) (5) and thus that there was no gain recognized by Old Spencer on the transaction under Section 112(c) (1) or Section 112(d) (2). From these conclusions, it followed that New Spencer's basis for depreciation of the machinery equalled Old Spencer's adjusted basis, Sections 113(a) (7) and (a) (8). Compare Portland Oil Co. v. Commissioner of Internal Revenue, 109 F.2d 479 (1 Cir.), cert. denied, 310 U.S. 650, 60 S.Ct. 1100, 84 L.Ed. 1416 (1940).

Our discussion of this complex question will proceed upon the following hypothesis: the judgment below can be affirmed only if all the following questions are answered in the Commissioner's favor. (A) Were the transactions of June 1952 properly viewed as steps in a unified plan? (B) Did taxpayers fail to establish that the promissory note received in exchange for Old Spencer's plant and machinery was not a "security"? If the note was "other property," did taxpayers establish that they realized gain on the unified transaction? (C) Assuming a unified plan of reorganization, and regardless of the status of the promissory note, was the plan properly placed within the coverage of Sections 112(b) (4) and (b) (5)? In light of our answers to (B) and (C), this issue must be remanded for further proceedings.

### A.

Taxpayers contend that the transaction of June 26, 1952, was an independent sale of Old Spencer's plant and equipment to New Spencer in which the latter's basis became its cost. However, we agree with Judge Levet that the New Spencer-Old Spencer transactions of June 1952 were steps in a unified scheme. The test for determining this question was most succinctly stated by the Tax Court in American Bantam Car Co., 11 T.C. 397, 405 (1948), aff'd per curiam, 177 F.2d 513 (3 Cir. 1949), cert. denied, 339 U.S. 920, 70 S.Ct. 622, 94 L.Ed. 1344 (1950):

> Were the steps so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series?

See Commissioner of Internal Revenue v. National Bellas Hess, Inc., 220 F.2d 415 (8 Cir. 1955); ACF–Brill Motors Co. v. Commissioner of Internal Revenue, 189 F.2d 704 (3 Cir.), cert. denied, 342 U.S. 886, 72 S.Ct. 176, 96 L.Ed. 665 (1951).

The issuance of New Spencer preferred and Class A common to Old Spencer, and the "sale" of Old Spencer's operating assets to New Spencer, were clearly parts of a basic plan to form a new corporation to take over the construction business. The plan contemplated the transfer of Old Spencer's good will, operating assets, and sufficient cash to continue operations to the new company. Old Spencer would remain only in the consulting business and would receive from New Spencer preferred stock and a promissory note, rather than all common stock, so that the new blood could eventually acquire 70% ownership of the new company. Under these circumstances, it should be immaterial for tax purposes that the parties accomplished their goals by means of two or three transactions in June of 1952 instead of one. We consider Judge Levet's finding of a unified scheme unassailable. Compare Hartford-Empire Co. v. Commissioner of Internal Revenue, 137 F.2d 540 (2 Cir.), cert. denied, 320 U.S. 787, 64 S.Ct. 196, 88 L.Ed. 473 (1943).

### B.

Viewing the June 1952 transactions as a unit, they fall within the general definition of a Section 112(b) (5) tax free transfer since Old Spencer was in complete control of New Spencer at the end of June 1952. In addition, the plan was obviously a "D" reorganization, Section 112(g) (1) (D), and hence tax free under Section 112(b) (4). But a further question is whether Old Spencer recognized gain on this plan, since Sections 113(a) (7) and (a) (8) permit a stepped-up basis to the extent of gain recognized.

No gain is recognized under Sections 112(b) (4) and (b) (5) only if the transferor corporation (Old Spencer) received "solely * * * stock or securities" of the transferee. If other property, or "boot" was received, gain if proven would be recognized to Old Spencer under Section 112(c) (1) or Section 112(d) (2), to the extent of such other property. An examination of the net assets received by Old Spencer in the June transactions, page 533 supra, reveals that it received preferred stock and Class A Common, which are clearly "securities," and the promissory note of $331,112.83 (the disputed second note will be disregarded). Taxpayers contend that Judge Levet wrongly classified this note as a security and that Old Spencer could therefore recognize gain to the extent of some $331,000. On this record, we agree.

In a long line of cases, it has been held that the term "securities" in Section 112(b) (4) does not include short term bonds and notes. See, e. g., LeTulle v. Scofield, 308 U.S. 415, 60 S.Ct. 313, 84 L.Ed. 355 (1940); Pinellas Ice & Storage Co. v. Commissioner of Internal Revenue, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428 (1933); Cortland Specialty Co. v. Commissioner of Internal Revenue, 60 F.2d 937 (2 Cir. 1932), cert. denied, 288 U.S. 599, 53 S.Ct. 316, 77 L.Ed. 975 (1933); Roebling v. Commissioner of Internal Revenue, 143 F.2d 810 (3 Cir.), cert. denied, 323 U.S. 773, 65 S.Ct. 131, 89 L.Ed. 618 (1944). This construction was adopted to insure that tax free status was only conferred upon transactions in which a meaningful continuity of ownership interest existed. See Helvering v. Minnesota Tea Co., 296 U.S. 378, 56 S.Ct. 269, 80 L.Ed. 284 (1935).

The question here is somewhat different because the entire transaction admittedly possessed sufficient continuity to qualify as tax free, and therefore whether the short term note is "other property" only affects the extent to which some gain may be immediately recognized. However, the same word "securities" is at issue in both situations, and this court has held that notes which do not meet the continuity test of *Pinellas* and *LeTulle* are not "securities" within the meaning of Section 112(b) (5). Lloyd-Smith v. Commissioner of Internal Revenue, 116 F.2d 642, cert. denied, 313 U.S. 588, 61 S.Ct. 1111, 85 L.Ed. 1543 (1941). The same approach was adopted *sub silentio* by the Fifth Circuit in Camp Wolters Enterprises v. Commissioner of Internal Revenue, 230 F.2d 555, cert. denied, 352 U.S. 826, 77 S.Ct. 39, 1 L.Ed. 2d 49 (1956), despite a contrary argument by the Commissioner, see 230 F.2d p. 558, n. 3. And, like this case, *Camp Wolters* involved the ultimate question of the basis of assets transferred. We conclude that the note received by Old Spencer must be examined to determine whether it meets the *Pinellas* definition of a security. See Pacific Public Serv. Co. v. Commissioner of Internal Revenue, 154 F.2d 713 (9 Cir. 1946).

The Tax Court summarized the test to be applied in determining whether a particular note is a security in the *Camp Wolters* case:

> The test as to whether notes are securities is not a mechanical determination of the time period of the note. Though time is an important factor, the controlling consideration is an overall evaluation of the nature of the debt, degree of participation and continuing interest in the business, the extent of proprietary interest compared with the similarity of the note to a cash payment, the purpose of the advances, etc. 22 T.C. 737, 751 (1954).

Judge Levet in applying this test, concluded that, "Here, there is no doubt that an overall evaluation of the transactions of June 1952 yield[s] the conclusion that the promissory note given by the New Company to the Old Company was a security within the meaning of Sections 112 (b) (4) and (b) (5)."

Although the Class A common and the preferred stock received by Old Spencer were securities, New Spencer's note must be independently analyzed. The record reveals that the note was for a short term (six months), and that it was paid by the New Company's check on January 7, 1953. An extremely short term note such as this which is paid nearly on time does not confer any proprietary interest on its holder in most situations. For this reason, this court has held that considerably longer termed notes were not securities. Lloyd-Smith v. Commissioner of Internal Revenue, supra (two years); L. & E. Stirn, Inc. v. Commissioner of Internal Revenue, 2 Cir., 107 F.2d 390 (1939) (one to five-years, paid in ten months). Given the bona fide intent of the owners of Old Spencer to reduce their equity holding in New Spencer, we cannot accept on so slight a record the assertion that the promissory note in question thwarted this intent by adding to Old Spencer's securities holding and equity interest in the new company.

The government in its brief on appeal does not attempt to support Judge Levet's ruling that the promissory note was a security. Instead, it urges us to affirm on the ground that the taxpayers have not sustained their burden of showing that Old Spencer in fact incurred a taxable gain on the transfer of its machinery. In theory the government's argument is of course sound because taxpayers must establish both the existence

of boot to enable recognition, and the fact of gain on the transfer, before a stepped-up basis is permitted under Sections 113 (a) (7) and (a) (8). See *Camp Wolters Enterprises,* supra. But here the contention is unworthy of detailed consideration. Among other things, the government attempts to establish the lack of a gain through computations which ignore the inconsistency pointed out in footnote 7 supra. Moreover, the government asserts that no value was proven for New Spencer's stock whereas it was stipulated that the preferred was issued for cash. We think the taxpayers put in enough evidence below to warrant the conclusion that at least some gain was realized by Old Spencer.

■ Therefore, on the facts before us, we would conclude that the promissory note received by Old Spencer was not a security, and that the case must be remanded to determine the amount of gain properly recognized by Old Spencer and the concomitant step-up properly allocable to New Spencer's basis. But in remanding the case, we do not preclude the government from reopening the question of whether the promissory note should be classed as a security. As we noted in footnote 8 supra, the record indicates that New Spencer issued $350,000 in preferred stock to Old Spencer on January 7, 1953. If this stock issuance was in substance a part of the redemption of the promissory note, then the question of whether the note was a security may take on a new light.[9] Under these circumstances, in remanding this part of the case, we do not foreclose further consideration of this issue.

## C.

Unfortunately, the foregoing are not the only problems which may appear on

9. Perhaps it was a similar consideration which prompted the government's contention on appeal that we ignore the note issued to Old Spencer as a "wash." The government cited Truck Terminals, Inc. v. Commissioner of Internal Revenue, 314 F.2d 449 (9 Cir. 1963), which involved an intricately camouflaged § 112 (b) (5) transfer. However, the transfer of machinery here was bona fide, and the *Truck Terminals* case does not support the government's argument that the note was a wash unless there is some evidence that the note was given to camouflage the issuance of another "security," such as preferred stock, to Old Spencer.

remand, for another legal issue is left open by this incomplete record. The Commissioner asserted, and Judge Levet held, that the transactions of June 1952 were part of a unified scheme. But the scheme as identified by all included the transfer of significant equity ownership of the new company to various younger employees of the old. This transfer of control seems an essential part of the overall plan, indeed, a part without which the transactions of June 1952 no doubt would not have taken place.

No stock was issued to employees until January 8, 1953, when 620 shares of New Spencer's Class B common were issued to ten employees. Eighty more shares were issued over the next 26 months. Although there was a seven-month delay and more from the incorporation of New Spencer, the delay was logically explained by the taxpayers' attorney:

> So when they actually sat down to decide, in the plan as it actually developed, who was going to get stock in the new company and how much stock they were going to get in the new company, for a great many of the men there was no question about it at all, but there was a question of how deep you wanted to go with the plan and how much you wanted each of the juniors to have * * * While these matters were being worked out, time slipped by. The plan itself was never doubted at all.

Under these circumstances, we think it can be seriously argued that the issuance of at least the first group of Class B shares should be considered as part of the unified scheme. The cases indicate that a substantial time lapse will lessen the likelihood that independent transactions will be unified, see American Bantam Car Co., supra; Schmieg, Hungate & Kotzian, Inc., 27 B.T.A. 337 (1932), but no case has placed a flat time limit on the unified plan doctrine. In this case, seven months is not a long delay in such a corporate reorganization. And the "mutual interdependence" of this phase seems clear. We conclude that the facts before us support an inference that the lower court took too restrictive a view of the scope of the plan in question.

If the issuance of some or all of the 700 shares of Class B common is unified with the June 1952 transactions, it cannot be determined on this record whether the plan falls within the definition of a tax free transfer under either 112(b)(4) or (b)(5). Of course, if the machinery transfer was not tax free, then New Spencer would be entitled to a stepped-up basis on the machinery.

Whether the requirements of Section 112(b)(4) would be met turns on whether the expanded plan was a "reorganization" within the meaning of Section 112(g)(1). It would only be a "C" reorganization if Old Spencer had transferred "substantially all" its assets to New Spencer, which seems open to question in light of the retained engineering license. To qualify as a "D" reorganization, Old Spencer "or its shareholders or both" must be in "control" of New Spencer "immediately after the transfer." Control is defined in Section 112(h) as the possession of "at least 80 per centum of the total combined voting power of all classes of stock entitled to vote." It appears from the exhibits that 455 of the first 620 shares of Class B shares were issued to shareholders of Old Spencer. Recipients of the final 80 shares owned no stock in the old company. Assuming that the Class A and Class B common are both voting shares, and that a share of each has the same "voting power" in New Spencer, facts which cannot be determined on this record, then Old Spencer and its shareholders "controlled" New Spencer if only the first 620 shares of Class B and all the Class A are included in the 80% computation. If the final 80 shares of Class B are included, control did not lie in Old Spencer and the unified plan failed to qualify under Section 112(b)(4).

The question whether the requirements of Section 112(b)(5) would be satisfied under this view of the unified plan is equally difficult. This section requires that "one or more persons" be in control of New Spencer after the transfers.

Since all the Class B shareholders were in the category "persons," the control provision here is obviously satisfied. See Von's Inv. Co. v. Commissioner of Internal Revenue, 92 F.2d 861 (9 Cir. 1937). But inclusion of the Class B holders brings into question the proviso to 112(b) (5) which stated:

> in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange.

Because the record fails to reveal what "property" the Class B shareholders transferred to New Spencer, we cannot decide whether this proviso was satisfied. However, even assuming that the Class B holders transferred property commensurate in value to the stock they received, we note that there remains the question whether the note received by Old Spencer created a "disproportion" which takes the transfer out of 112(b) (5). This question is apparently one of first impression.

The proviso caused such disagreement and confusion during its existence that the Court of Appeals could not agree even on a formula to apply in determining the relative degree of "disproportion." Compare Hawaiian Freight Forwarders, Ltd. v. Commissioner of Internal Revenue, 196 F.2d 745 (9 Cir. 1952); L. W. Tilden, Inc. v. Commissioner of Internal Revenue, 192 F.2d 704 (5 Cir. 1951); Mather & Co. v. Commissioner of Internal Revenue, 171 F.2d 864 (3 Cir.), cert. denied, 337 U.S. 907, 69 S.Ct. 1049, 93 L.Ed. 1719 (1949); Bodell v. Commissioner of Internal Revenue, 154 F.2d 407 (1 Cir. 1946); Budd International Corp. v. Commissioner of Internal Revenue, 143 F.2d 784 (3 Cir.), cert. denied, 323 U.S. 802, 65 S.Ct. 562, 89 L.Ed. 640 (1944); United Carbon Co. v. Commissioner of Internal Revenue, 90 F.2d 43 (4 Cir. 1937). The proviso was eliminated in 1954 when Section 112(b) (5) was recodified as Section 351 of the Internal Revenue Code of 1954, the legislative history explaining that the "propor-

tion" test had created more uncertainty and confusion than it was worth. See H. R. Rep. No. 1337, 83d Cong., 2nd Sess. (1954), 3 U.S.Code Cong. and Admin.News 1954, pp. 4025, 4065, 4254–4255.

Thus, we have little guidance with respect to this proviso's proper interpretation. Its literal language, when combined with the parties' intent to shift equity interest to the new blood, seems to imply that Old Spencer's receipt of the note created a disproportion in the "stock and securities received by each" of the transferors. However, the decision may well hinge on whether the note received by Old Spencer was a "security". Under these circumstances, we think the parties should be given an opportunity to focus the relevant facts and arguments on remand. Compare Blair v. Commissioner of Internal Revenue, 91 F.2d 992 (2 Cir. 1937); Bell v. Commissioner of Internal Revenue, 139 F.2d 147 (3 Cir. 1943).

### IV. *Spencer's Motion to Amend*

After Judge Levet's opinions in these cases were announced, but before judgments issued, Spencer moved to amend its complaint so as to assert a claim for refund of the capital gain Old Spencer declared and paid on the transfer of its plant and equipment. Judge Levet denied this motion, and the parties press the issue on appeal.

█ As a matter of law, if the transfer was part of a tax free transaction in which New Spencer received a carryover basis, then Old Spencer erroneously declared a taxable gain in its 1952 return. Under Section 1312(6) of the Internal Revenue Code of 1954 (formerly Section 3801(b) of the 1939 Code), the statute of limitations cannot deprive Old Spencer of any refund due because of such a "double payment." Inasmuch as issue III must be remanded, we see no need to decide whether Judge Levet's denial of the motion was an abuse of discretion. We do suggest, however, that the government permit the taxpayers to open this issue

on remand, since it turns on the facts that will be developed at the retrial.

The order of the district court involving Turner is affirmed. The order involving Spencer is affirmed in part and reversed in part and remanded for further proceedings consistent with this opinion.