Francesco Gaglione v. Commissioner.
Gaglione v. Commissioner
Docket No. 4842-67.
United States Tax Court
T.C. Memo 1969-194; 1969 Tax Ct. Memo LEXIS 101; 28 T.C.M. (CCH) 1024; T.C.M. (RIA) 69194; September 25, 1969. Filed *101 Alan L. Swartz, Industrial Bank Bldg., Providence, R.I., for the petitioner. Rufus E.Stetson, Jr., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in petitioner's 1961 income tax in the amount of $6,226.72 and an addition to tax under section 6653(a), I.R.C. 1954, in the amount of $311.33. The adjustment giving rise to this deficiency was a determination of a $16,245.03 understatement of adjusted gross income computed by "the so-called source and application of funds method." The only two items in controversy in respect of that determination are (1) the amount of cash available to petitioner from nontaxable sources during 1961, particularly the amount of his cash on hand at the beginning of the year and (2) the amount of his living expenses. Petitioner also makes claim in his petition to a bad debt deduction in the amount of $895. Although the petition appears to challenge the addition to tax under section 6653(a), no evidence was presented in respect of that issue, nor was any argument made by petitioner on brief relating thereto; accordingly, it is here deemed to have been abandoned, *102 except to the extent that the amount thereof is governed by the amount of the underpayment of tax. Findings of Fact The parties have filed two stipulations of facts, which, together with the attached exhibits, are incorporated herein by this reference. Petitioner resided in Cranston, Rhode Island at the time of filing the petition in this case, and filed his income tax return for 1961 with the district director of internal revenue in Providence, Rhode Island. Petitioner is married, and at the time of trial was 56 years old; he had a son aged 34 and a daughter aged 27 or 28. Both children were married throughout 1961 and did not live with petitioner and his wife. The son was not then fully self-supporting and received some financial assistance from petitioner, including funds for law school tuition as well as other purposes. On page 1 of his 1961 return petitioner described his occupation as "contractor", and on Schedule C thereof he described his principal business activity as "Contractor & Real Estate." For approximately 20 years, "off and on", his "contracting" activities have consisted of buying one or more lots of land from time to time, subcontracting the building of *103 houses on such lots and then selling the completed properties to individual purchasers. He was in the business of trucking sand and gravel during 1943 and 1944, and he operated a "package" store during 1948 and 1949. He did not carry on his contracting activities on any large or extensive scale. Thus during 1954 and 1955 he built two houses. During the years 1956, 1957 and 1958 he built some six houses, for which he received full payment on sale, as follows: Date of Sale
Sale Price
5/28/56
$12,000
4/24/57
13,500
5/28/57
13,500
10/10/57
13,500
3/27/58
13,500
5/ 7/58
13,500 In addition to these sales, he sold one of his houses in 1957 to a person named Tutalo for $14,000, receiving $2,000 cash and taking a note for the balance secured by a mortgage on the property. In 1961 petitioner resided with his wife in a house which he owned and which he had built in 1940 through subcontractors. There were no mortgages in respect of that 1025 property. It was a 10-room house with a 2-car garage, and was occupied solely by petitioner and his wife, except for an apartment on the second story which was occupied by a younger sister of petitioner whom he had raised *104 since she was eight years old and who paid little or no rent for such quarters. There was a bar in the basement. In 1954, petitioner sold a property owned and built by him known as the Bel Air Motel for a total sales price of $60,000. In respect of that price he received the following consideration in 1954: $15,000 in cash, two short-term notes in the amount of $5,000 each (one of which was given to the real estate broker as commission), the assumption of an outstanding $16,000 first mortgage, and a purchase money mortgage payable to petitioner in the amount of approximately $19,000. Petitioner actually received payment on the $5,000 note retained by him in 1955. Payments on the purchase money mortgage were deposited in a joint savings account which was opened for that purpose with petitioner's wife at the Olneyville branch of the Plantations Bank of Rhode Island. Such deposits, reflecting periodic payments, were at first in the amount of $157.81 each, three in 1954 and seven in 1955. These were followed by a deposit in the amount of $8,777.53 in October 1955 representing a prepayment on the mortgage, and thereafter the periodic payments were reduced to $78.73 each, one in 1955 and *105 seven in 1956. A final deposit in the amount of $9,700 in July 1956 completed the collection in respect of the mortgage. The account remained open, but no further deposits were made in it through 1961. Interest was accrued throughout these years. A total of $19,162.75 was withdrawn from the account through the end of 1961, as follows: Date
Amount of Withdrawal
8/ 4/55
$ 500.00
8/17/55
500.00
3/ 2/56
4,600.00
8/27/56
1,000.00
9/ 4/56
4,000.00
11/26/56
3,000.00
12/31/57
5,000.00
2/26/60
500.00
3/14/61
62.75
$19,162.75 The balance in the account at the end of 1960 was $2,139. Since the end of 1961 there have been two withdrawals and one deposit in this account. The balance as of April 8, 1966 was $1,205.20, and there has been no activity in the account since then, apart from the accumulation of interest. Payments on the mortgage with respect to the property sold to Tutalo, previously referred to, were deposited in another joint savings account at the Olneyville branch of the Plantations Bank, opened in the names of petitioner and his wife for that purpose. The periodic payments, commencing March 12, 1957, were in the amount of $94.55 each. Through *106 the end of 1960, such deposits were in the aggregate amount of about $3,500, and withdrawals were made from this account in the amount of $3,189.39. In 1961 the Tutalo mortgage was sold to the Silver Lake Loan Company in exchange for $10,000 worth of debentures of that company. In addition to the two foregoing savings accounts, petitioner, at some time during the period 1954-1956, opened a checking account at the Plantations Bank which he used to some extent in his contracting business and investing activities, but not otherwise for personal purposes. He also maintained a savings account in his wife's name at the Old Stover Bank, which had a balance of about $1,000 during the late 1950's, and which has remained inactive since that time. Petitioner used cash to a considerable extent in his contracting business, as well as in his investment activities, hereinafter described. Also, he often converted cash into cashier's checks which he used for such purposes. In his contracting business, he would purchase the land for cash and would at times pay the construction costs with his own cash and at other times by means of construction mortgages. In 1957, petitioner's children and sister *107 gave a 25th anniversary party for petitioner and his wife. Some 250 friends and relatives attended, and the couple received some cash gifts on that occasion. In 1956, petitioner began to invest in stocks and securities. On March 2, 1956, he withdrew $4,600 from the savings account into which the proceeds from the Bel Air motel sale were being deposited and purchased 100 shares of RCA stock. The stock was later sold. In 1958, petitioner began to invest more heavily. During this period he used the services of three brokerage firms, Davis & Davis, Diamond Doorley 1026 Douglas & Co., Inc., and Merrill Lynch, Pierce, Fenner & Smith. The following table sets forth certain stock transactions of petitioner prior to 1961: Shares
Bought
For
Sold
For
l200 RCA
8/20/58
$6,800.00
9/3/58
$7,150.00
100 Television Industries
12/16/58
513.00(net)
11/14/60
363.18(net)
100 Int'l. Recreation
7/27/59
1,750.00(net)
1/22/60
1,700.07(net)
100 Television Industries
8/14/59
448.88(net)
11/14/60
350.93(net)
200 Radio Frequency
10/17/59
600.00(net)
11/30/59
824.68(net)
300 Television Industries
11/16/60
621.00(net)
11/17/60
1,311.46(net)
600 Kingsford
3/16/59
1,629.85(net)
(sold in
1961)
1 Superior Oil Co. of
10/15/59
1,381.75(net)
Calif.
100 Dyna Therm Chem.
12/28/59
300.00(net)
(sold in
1961)
400 Rhodesian Selection
10/25/60
524.42(net)
Trust
200 Reinsurance Invest.
7/16/59
753.18 (net)
Corp.
100 Amer. Petrofina
8/7/59
963.20(net)
100 Detroit Steel Corp.
9/1/59
2,277.05(net)
200 Vertientes Camaguey
10/9/59
1,416.91(net)
Sugar Co. of Cuba
300 Yorktown Products
10/15/59
1,056.31(net)
100 Avco Corp.
12/18/59
1,622.82(net)
50 Television Industries
11/14/60
174.51(net)
*108 The foregoing does not necessarily represent a complete list of petitioner's securities transactions prior to 1961. The following table sets forth certain stock transactions made by petitioner in 1961: Shares
Bought
For
Sold
For
100 Raytheon Co.
1/11/61
$3,775.34(net)
4/4/61
* $4,183.67 (net)
400 New Haven Clock
2/7/61
524.00(net)
3/7/61
521.78(net)
100 Gen'l. Tel.
2/21/61
2,858.28(net)
4/7/61
2,960.59(net)
Electr. Corp.
100 Textron Inc.
2/21/61
2,493.81(net)
2/23/61
2,662.36(net)
100 San Diego
3/10/61
1,042.25(net)
3/14/61
1,152.74(net)
Imper. Corp.
200 Equity Corp.
4/5/61
1,074.50(net)
5/16/61
1,095.27(net)
100 Dynamics Corp.
4/6/61
1,206.38(net)
4/18/61
1,313.57 (net)
Amer.
100 Int'l.
4/10/61
3,159.63(net)
4/11/61
3,358.57(net)
Resistance
100 Indust. Elect.
4/13/61
587.75(net)
4/28/61
708.45(neet)
Hardware
200 Amer.
4/19/61
2,034.00(net)
5/16/61
2,256.03(net)
Electronics Calif.
25 Richardson,
4/21/61
2,573.47(net)
11/28/61
2,642.48(net)
Merrell, Inc.
100 United
5/19/61
2,229.00(net)
11/28/61
2,252.65(net)
Merchants Mfg.
100 Dyna Therm
(Bought in
2/3/61
475.42(net)
Chem.
1959)
600 Kingsford
(Bought in
4/4/61
1,665.78(net)
1959)
100 Rhodesian
1/9/61
131.15(net)
Selection Trust
100 Tidewater Oil
2/24/61
2,732.50(net)
Co.
100 M. Lowenstein
4/27/61
1,698.75(net)
Inc.
100 Chemway Corp.
5/2/61
953.88(net)
100 F X R Inc.
5/2/61
2,178.50(net)
100 Lehigh Valley
5/18/61
207.00(net)
Indust.
200 Lodge & Shipley
5/19/61
414.00(net)
Co.
200 Amer.
8/1/61
1,705.76(net)
Electronics Calif.
300 Metromedia Inc.
11/28/61
4,641.75(net)
100 Amer.
11/29/61
701.38(net)
Electronics Calif.
100 Rhodesian
12/14/61
118.50 (net)
Selection Trust
$39,041.58
*109 Exclusive of the Silver Lake Loan Co. $10,000 debentures previously referred to, petitioner during 1961 purchased securities at a total cost of $39,041.58. The parties appear to agree that the adjusted basis of securities sold by petitioner in 1961 was $27,894.01, of which $1,929.85 was allocable to securities purchased prior to 1961. In 1960, petitioner was involved in an automobile accident and was sued. In an effort to defeat the claims of a potential judgment creditor in that litigation, he transferred certain of his securities to the names of his son-in-law and daughter. Petitioner kept physical possession of the securities, retained full control over their disposition, and reported the dividends received as his income. The suit was settled sometime in 1961, and petitioner caused the securities to be transferred back into his or his wife's name. The securities transactions listed above include at least some, 1027 if not all, of those that were executed in the names of petitioner's son-in-law and daughter. Petitioner purchased some real estate in 1961 for $5,000 in cash. Petitioner *110 on various occasions during the period 1955-1961 (except 1956) borrowed funds on short-term loans from the Plantations Bank of Rhode Island in amounts ranging from $900 to $3,500, and during the years 1963-1966 in amounts ranging up to $5,000. The interest on such loans was generally in the range of 6 to 7 percent. It does not appear that any such loans were outstanding as of the end of 1961. During the year 1960 petitioner from time to time engaged in gambling activities. His net winnings were "a couple of thousand dollars more or less". In accordance with petitioner's practice of dealing to a certain extent in cash, he kept cash in varying amounts from time to time at his home or on his person. Such cash at the close of 1960 was not in excess of $8,000. On February 9, 1961, petitioner rented a safe deposit box at the Rhode Island Hospital Trust Company in Providence. He placed the bulk of his cash as well as his securities in the box. He visited the box 14 times during 1961, but made no such visits in 1962. His cash at the end of 1961 was in the amount of approximately $3,000. During 1961 petitioner owned a 1960 model Ford automobile. His wife had a mink coat as well as a mink *111 stole, both purchased prior to 1961. Personal living expenses incurred by petitioner during 1961 for himself and his wife were not less than $4,975.58. Petitioner made a loan to his son-in-law in 1960. During 1961 he received repayment or repayments in respect of that loan in the aggregate amount of $750. Petitioner did not maintain any adequate books or records of his income or expenses in 1961. No books of any kind were offered in evidence or even shown to have been in existence at any time from which petitioner's 1961 taxable income could have been determined. total adjusted gross income in the total adjusted gross income in the amount of $5,005.60, consisting of the following three components: (a) Dividends and interest
$ 959.78
(b) Gains from trading in securities
* 1,645.82
(c) Profit from business or profession (from Schedule C)
2,400.00
$5,005.60 Schedule C ("Profit (or Loss)From Business or Profession") which was attached to the return called for many details, including total receipts, merchandise purchased, cost of labor, *112 materials and supplies, salaries and wages, and a number of other items pertinent to the determination of net profit from the conduct of a business. Petitioner furnished no details whatever on his Schedule C, except for setting forth an ultimate profit figure of $2,400. In computing his tax on the return petitioner took the standard deduction [1] and claimed two personal exemptions (for himself and his wife) in the amount of $1,200. In his notice of deficiency, the Commissioner, by use of "the so-called source and application of funds method" determined that petitioner had understated his adjusted gross income by $16,245.03. The computation was as follows: EXPENDITURES:
Stocks[and debentures] acquired during 1961 (at cost)
$49,041.58
Real estate acquired in 1961
5,000.00
Personal Living Expense
4,975.58
Income Tax Paid
323.00
$59,340.16
SOURCES OF FUNDS:
Decrease in cash in banks
69.06
Cash on Hand (Sale of Mortgage)
10,000.00
Adjusted basis of stock sold dur- ing 1961
27,894.01
Adjusted gross income corrected [2]
4,975.58
Nontaxable portion of corrected capi- tal gain
156.48
Total
$43,095.13
Understatement of adjusted gross in- come
$16,245.03
*113 In computing petitioner's taxable income, the Commissioner allowed him a standard 1028 deduction of $500. The Commissioner further determined that the underpayment was due to negligence or intentional disregard of rules and regulations, and asserted the five percent addition to tax provided by section 6653(a), I.R.C. 1954. In his petition, petitioner not only challenged the foregoing determination, but also claimed to be entitled to a bad debt deduction of $895. This claimed loss grew out of the following circumstances. Joseph Ventrone, a son of petitioner's cousin, was engaged in the wholesale grocery business through a corporation known as Arthur Ventrone, Inc. In 1960 petitioner made a loan of $4,000 to Joseph Ventrone, which he understood was to be used in that business. He received *114 repayment in the amount of $3,105 in 1960. In 1961, Joseph Ventrone gave him a check for $895 drawn on the corporation's account. Petitioner presented the check for payment several times at the drawee bank, but learned on each occasion that there were insufficient funds. Petitioner informed Joseph of this fact and Joseph gave him $200, thus leaving $695 of the debt unpaid. Joseph promised to give him another $200 the following week, but did not do so. The corporation went into receivership in 1961 and was dissolved by court order dated December 12, 1961. Petitioner did not file any claim in the receivership proceedings. Petitioner has not yet received payment of the remaining balance of $695 with respect to his loan. The loan was in fact made to Joseph Ventrone, not to the corporation, and the record fails to disclose that the balance was uncollectible from him as of the end of 1961. Opinion RAUM, Judge: Petitioner's failure to keep or produce adequate books and records relating to his income and expenses made it virtually impossible to conduct an audit of his return by customary methods. Accordingly, the Commissioner was fully justified in using the method that he did in determining *115 taxable income, namely, to compute all nondeductible expenditures made by petitioner during the taxable year (e.g., purchases of securities, living expenses, etc.), and to subtract therefrom all known funds from nontaxable sources available to petitioner from which he could have made such expenditures (e.g., cash on hand as of the beginning of the taxable year reduced by cash on hand as of the end of the taxable year, gifts or repayments of loans received during the year, etc.). The resulting difference, or the excess of the expenditures over all possible nontaxable sources, may therefore fairly be regarded as having their source in taxable income realized during the year. Petitioner does not challenge that method, and, indeed, there would not have been any sound basis for such challenge in the circumstances of this case. He disputes only two items in the Commissioner's determination: (1) personal living expenses in the amount of $4,975.58 and (2) cash on hand. The burden of proof is, of course, upon petitioner, and we have concluded that he has largely failed to carry it with credible evidence. Preliminarily, we comment generally upon the unsatisfactory state of the record and upon *116 our impressions as to petitioner's credibility. We found his testimony often vague, slippery, and evasive. He appeared to be all too ready to bend the facts to what he considered to be his best advantage, and we had little confidence in much of what he testified. We were troubled by many aspects of his testimony. For example, he was asked about the $2,400 item appearing on his 1961 return as net profit "from business or profession." This was the largest single item on a return that reported gross income of $5,005.60. It appeared on the return without any of the required supporting details or explanation. Yet, when inquiry was made of him at the trial as to where that $2,400 came from, he replied "I can't recall that, Your Honor". Later, after a recess, he indicated that his memory had been refreshed by his son, and he then testified that the $2,400 related to the sale of a house that he had built for his son. Even though that testimony was generally corroborated still later by the son, it was so unsatisfactory that we had very little confidence in it in the context of the entire record. We proceed to a consideration of the specific items that are in controversy. 1. Personal living *117 expenses. The Commissioner determined petitioner's 1961 nondeductible living expenses to be $4,975.58. Petitioner testified generally that his living expenses were about $65 or $70 a week. Petitioner's counsel challenges the Commissioner's determination as being arbitrary, and he relies upon petitioner's testimony for the amount actually spent by petitioner in 1961 for this purpose. 1029 Obviously, it is impossible as a practical matter to fix living expenses with mathematical accuracy, and whatever figure is used must of necessity be artificial to a certain extent. The most that can be expected is a reasonable estimate, and upon our evaluation of the evidence we do not accept petitioner's testimony, since we think it was shaded in his favor. At the same time, although we do not necessarily accept the Commissioner's $4,975.58 figure as accurate, we have found that the living expenses were not in fact less than that amount. Petitioner and his wife lived in a 10-room house with a 2-car garage. He owned a late model automobile. The evidence shows that he gave his adult married son at least some financial assistance. Petitioner's wife had a mink coat and a mink stole, and although *118 they had been purchased prior to 1961, they were some evidence of the standard of living maintained by petitioner and his wife. We, of course, are aware that petitioner owned his home and that it was not encumbered. Nevertheless, it is our conclusion on the evidence that the total personal living expenses for himself and his wife (including financial assistance to his son) were substantially in excess of $65 or $70 a week, as testified by petitioner, and we have been unable to find that such expenses were less than $4,975.58 as determined by the Commissioner. Petitioner's counsel points out that the figure used by the Commissioner was the full amount of petitioner's gross income shown on his return ($5,005.60) after certain specific adjustments. While this perhaps points up the artificiality of the figure, it may nevertheless be acceptable if it is at least within the range of a reasonable estimate, and on our appraisal of the evidence we are satisfied not only that it is within such range, but that petitioner's living expenses were in fact not less than that amount. We have so found as a fact. 2. Cash on hand. Although the Commissioner's determination contains an item referred *119 to as "Cash on Hand (Sale of Mortgage)" in the amount of $10,000, this refers to the exchange of the Tutalo mortgage for the $10,000 Silver Lake Loan Co. debentures, which both parties regard as a "wash" transaction. Accordingly, upon eliminating this item, it is apparent that the Commissioner allowed petitioner nothing whatever for cash on hand. In this we think he erred, but we are equally satisfied that petitioner did not have $30,000 in cash on hand, as claimed by him. Here, too, his testimony was not convincing. The record defies any effort to trace petitioner's alleged available cash resources with accuracy. We learn of certain amounts that came into his hands from time to time, but we have no way of knowing how much remained in his possession as of the beginning of 1961. The evidence in this respect was most unsatisfying. Indeed, there was even substantial doubt as to whether certain funds in fact ever did come into petitioner's hands. There was testimony that some 250 persons attended a 25th anniversary party for petitioner and his wife and that the guests gave him a total of $9,000 in cash gifts. Although we did find that such a party was held and that petitioner did in *120 fact receive some cash gifts, the testimony as to an aggregate of $9,000 cash gifts puts too much strain on our credulity to accept any such figure as true or accurate in the absence of more convincing supporting evidence. We need not review the evidence further. Suffice it to say, we do not believe the testimony that petitioner had $30,000 cash on hand at the beginning of 1961. On the other hand, it is our impression on this record that petitioner did have a substantial amount of cash on hand in view of his practice of carrying on his affairs to a considerable extent in cash. In the circumstances, while we cannot find that petitioner had $30,000 in cash, as claimed by him, neither can we find that he had nothing, as contended by the Commissioner. The matter calls for the exercise of our best judgment under these murky conditions, cf. Cohan v. Commissioner, 39 F. 2d 540, 544 (C.A. 2), and in the exercise of that judgment we have found as a fact that petitioner had cash on hand in the amount of $8,000 as of the beginning of 1961. See Michael Potson, 22 T.C. 912, 928-929, affirmed sub nom. Bodoglau v. Commissioner, 230 F. 2d 336, 340-341 (C. *121 A. 7); David J. Pleason, 22 T.C. 361, 371, affirmed, 226 F. 2d 732 (C.A. 7), certiorari denied 350 U.S. 1006. Closely related to the amount of cash-on-hand issue is petitioner's contention that he had additional cash resources during 1961 as a consequence of repayment to him during 1961 of a loan which he had 1030 allegedly made to his son-in-law in 1960. There was testimony that petitioner had made such a loan in the alleged amount of $2,600 in June 1960, and that repayments were made from time to time. The amounts and times of such repayments were not satisfactorily established. The evidence was loose, and we were left without any real conviction that petitioner had in fact received a repayment of $2,600 or any major portion thereof during 1961. Bearing in mind that the burden was on petitioner, we cannot find that it was carried with evidence as weak as that presented with respect to this matter. Nevertheless, we were satisfied that petitioner had made a loan to his son-in-law, in some amount during 1960, and that there was some repayment in 1961. We have found as a fact, cf. Cohan v. Commissioner, supra, that petitioner *122 received $750 from his son-in-law in 1961 as repayment of that loan. That amount must be taken into account as additional nontaxable resources available to petitioner in 1961. 3. Ventrone bad debt. In his petition, petitioner seeks an $895 deduction for an alleged bad debt loss. The evidence discloses that Joseph Ventrone, a son of petitioner's cousin, was engaged in the wholesale grocery business and operated through a corporation known as Arthur Ventrone, Inc. Joseph required funds for the use of the business and petitioner gave him $4,000 in 1960. Of that amount $3,105 was returned to petitioner in 1960. In 1961 Joseph gave petitioner a check for $895 drawn on the corporation's account in payment of the balance. The check was not honored by the drawee bank, and Joseph subsequently gave petitioner $200 in cash. The corporation went into receivership and was liquidated in December 1961. Petitioner did not file a claim in the receivership proceedings. We cannot find that petitioner in 1961 sustained a bad debt loss of $895, or of $695, as now claimed by him. There was no satisfying evidence that petitioner made his loan to the corporation, rather than to Joseph. To the contrary, *123 the evidence more convincingly shows that petitioner dealt with Joseph as an individual and that he regarded Joseph as his debtor. And there was no showing that petitioner's rights against Joseph became worthless as of the end of 1961. We decide this issue against petitioner. We note, however, that since petitioner received $200 in 1961, in partial repayment of the loan, this $200 represents additional nontaxable cash resources in 1961 which must be taken into account in the computation of his 1961 taxable income. Decision will be entered under Rule 50. Footnotes
*. Sale includes 3 shares received as stock dividend; thus 103 shares were sold.↩
*. This figure was arrived at after eliminating the nontaxable portion of long-term capital gain in the amount of $117.50.↩
1. This was erroneously taken in the amount of $500.56 rather than $500, which was the maximum then allowable in the case of a married person filling a separate return.↩
2. There is no explanation in the deficiency notice as to what was corrected to cause these figures to differ from those on the tax return. Petitioner's reply brief states that the adjustment was agreed upon prior to the issuance of the notice and related to a previously unreported capital gain and the fact that one reported short-term gain was actually long term.↩