JACOB S. KAMBORIAN AND ELIZABETH KAMBORIAN, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5832–69—5835–69. Filed July 27, 1971.

*James D. St. Clair*, for the petitioners.
*Robert B. Dugan*, for the respondent.

---

[1] Cases of the following petitioners are consolidated herewith : Jacob S. Kamborian, Jr., and Nancy M. Kamborian, docket No. 5833–69 ; Gene E. Godley and Lisbeth K. Godley, docket No. 5834–69 ; and Michael M. Becka, docket No. 5835–69.

848

854

OPINION

RAUM, *Judge:* 1. *Exchange of Campex stock for International stock.*—Petitioners contend that the gain they realized on their transfer of Campex stock to International in return for International's common stock qualifies for nonrecognition under section 351(a), I.R.C. 1954.[2] That section provides for nonrecognition of gain or loss on the transfer of property to a corporation in exchange for the corporation's stock or securities—if immediately after the exchange the transferor or transferors are "in control" of the corporation. Section 351(a) makes reference to section 368(c), I.R.C. 1954, for the definition of "control";

SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.

(c) CONTROL.—For purposes of part I (other than section 304), part II, and this part, the term "control" means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation.

[2] SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.

(a) GENERAL RULE.—No gain or loss shall be recognized if property is transferred to a corporation (including, in the case of transfers made on or before June 30, 1967, an investment company) by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property.

Immediately after the exchange here in issue the stock of International was held as follows:

| | Shares of— | | |
| --- | --- | --- | --- |
| | Class A (voting common) | Class B (nonvoting common) | Percent of total of each class [3] |
| Jacob S. Kamborian Revocable Trust | 22,108 | 198,971 | 56.01 |
| Jacob S. Kamborian, Jr | 4,403 | 39,627 | 11.16 |
| Lisbeth (Kamborian) Godley | 3,803 | 34,227 | 9.64 |
| Michael Becka | 197 | 1,775 | 0.50 |
| Elizabeth Kamborian Trust | 5,042 | 45,376 | 12.77 |
| Others | 3,916 | 35,244 | 9.92 |
| Total | 39,469 | 355,220 | |

Petitioners contend that the transferors of property for purposes of section 351(a) were the five named stockholders listed above and that their percentage stockholdings after the transfer satisfy the 80-percent control requirement imposed by sections 351(a) and 368(c).

The Commissioner's position is that only the first four stockholders listed above—i.e., the former owners of Campex—may be considered as transferors of property here, that the fifth (the Elizabeth Kamborian Trust) may not be taken into account in this connection, and that since there would thus be a failure to satisfy the control requirement, all gain realized on the exchange must be recognized. In particular, he urges that International stock issued to the Elizabeth Kamborian Trust in return for $5,016 does not qualify as stock issued for property within the meaning of section 351(a) and that consequently the persons making qualified transfers of property to International in return for its stock held only 77.3 percent of its stock after the exchange. The Commissioner relies on regulations section 1.351–1(a)(1)(ii):

Sec. 1.351–1  Transfer to corporation controlled by transferor.

(a)(1) Section 351(a) provides, in general, for the nonrecognition of gain or loss upon the transfer by one or more persons of property to a corporation solely in exchange for stock or securities in such corporation, if immediately after the exchange, such person or persons are in control of the corporation to which the property was transferred. As used in section 351, the phrase "one or more persons" includes individuals, trusts, estates, partnerships, associations, companies, or corporations (see section 7701(a)(1)). To be in control of the transferee corporation, such person or persons must own immediately after the transfer stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of such corporation (see section 368(c)). In determining control under this section, the fact that any corporate transferor distributes part or all of the stock which it receives in the exchange to its share-

---

[3] The percentages listed below differ slightly from those appearing in our Findings of Fact at p. 856 which were taken from the authorized agreement of Sept. 1, 1965, as stipulated by the parties.

holders shall not be taken into account. The phrase "immediately after the exchange" does not necessarily require simultaneous exchanges by two or more persons, but comprehends a situation where the rights of the parties have been previously defined and the execution of the agreement proceeds with an expedition consistent with orderly procedure. For purposes of this section—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(ii) Stock or securities *issued for property which is of relatively small value in comparison to the value of the stock and securities already owned* (or to be received for services) by the person who transferred such property, *shall not be treated as having been issued in return for property if the primary purpose of the transfer is to qualify under this section* the exchanges of property by other persons transferring property.

For the purpose of section 351, stock rights or stock warrants are not included in the term "stock or securities."

[Emphasis supplied.]

The Commissioner contends that since the Elizabeth Kamborian Trust purchased only 42 shares of class A common and 376 shares of class B common, the securities issued were "of relatively small value" in relation to the 5,000 shares of class A common and 45,000 shares of class B common which it already held and that the primary purpose of the transfer was to qualify the exchange of Campex stock by the other stockholders for nonrecognition treatment under section 351(a).

Petitioners attack the Commissioner's position on a variety of grounds. They urge (a) that regulations section 1.351–1(a)(1)(ii) is invalid; (b) that even if valid it is inapplicable to the transaction in issue; and (c) that even if the regulation is valid and applicable, the Commissioner's determination of the fair market value of the International stock received by petitioners is erroneous.

(a) *Validity of the regulation.*—Initially we note the well-settled principle that "Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes and that they constitute contemporaneous constructions by those charged with administration of these statutes which should not be overruled except for weighty reasons." *Commissioner* v. *South Texas Lumber Co.*, 333 U.S. 496, 501; see also *Bingler* v. *Johnson*, 394 U.S. 741, 749–750; *Colgate Co.* v. *United States*, 320 U.S. 422, 426; *Fawcus Machine Co.* v. *United States*, 282 U.S. 375, 378; *Brewster* v. *Gage*, 280 U.S. 327, 336; *Textile Mills Corp.* v. *Commissioner*, 314 U.S. 326, 336–339; *Boske* v. *Comingore*, 177 U.S. 459, 470; *Regal, Inc.*, 53 T.C. 261, 263–264, affirmed per curiam 435 F. 2d 922 (C.A. 2); *William F. Sanford*, 50 T.C. 823, 832, affirmed 412 F. 2d 201 (C.A. 2), certiorari denied 396 U.S. 841; cf. *United States* v. *Correll*, 389 U.S. 299, 307.

In arguing that regulations section 1.351–1(a)(1)(ii) is invalid, petitioners point first to the "proportionate interest" test which was

included in section 112(b)(5), the predecessor of section 351, under the 1939 Code:

SEC. 112.  RECOGNITION OF GAIN OR LOSS.

(b) EXCHANGES SOLELY IN KIND.—

\*       \*       \*       \*       \*       \*       \*

(5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; *but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange.* Where the transferee assumes a liability of a transferor, or where the property of a transferor is transferred subject to a liability, then for the purpose only of determining whether the amount of stock or securities received by each of the transferors is in the proportion required by this paragraph, the amount of such liability (if under subsection (k) it is not to be considered as "other property or money") shall be considered as stock or securities received by such transferor. [Emphasis supplied.]

The "proportionate interest" test was eliminated when section 351 was enacted in 1954. The committee reports reflect congressional dissatisfaction with the uncertainty which had developed in applying the test (H. Rept. No. 1337, 83d Cong., 2d Sess., pp. A116–A117 (1954)):

The basic change from present law made by your committee in section 351 is the elimination of the so-called "proportionate interest" test. This requirement, which appears in section 112(b)(5) of the 1939 Code, permits nonrecognition of gain and loss only if the stock and securities received by each transferor are "substantially in proportion" to the interest of such transferor in the property prior to the exchange. This requirement, which, if unsatisfied, serves to vitiate the tax-free nature of the entire transaction, caused considerable uncertainty in its application. In eliminating the proportionate interest test your committee intends that no gain or loss will be recognized to a transferor transferring property to a corporation under section 351 irrespective of any disproportion of the amount of stock or securities received by him as a result of the transfer. Thus, if M and N each owning property having a value of $100 transfers such property to a newly formed corporation X, and M receives all of the stock, such transaction would not be subject to tax under section 351. To the extent, however, that the existing disproportion between the value of the property transferred and the amount of stock or securities received by each of the transferors results in an event taxable under other provisions of this code, your committee intends that such distribution will be taxed in accordance with its true nature. For example, if individuals A and B, father and son, organize a corporation with 100 shares of common stock and A transfers property worth $80 in exchange for 20 shares of stock, while B transfers property worth $20 to the corporation in exchange for 80 shares of stock, no gain or loss will be recognized under section 351. If, however, it is determined that in fact A has made a gift to B, it is your committee's intention that such gift would be subject to tax under the provisions of section 2501 and following. Similarly, if in

the preceding example, B had rendered services to A and the disproportion in the amount of stock received constituted, in effect, the payment of compensation by A to B, it is your committee's intention that such compensation will be appropriately taxed. B will be taxable upon the fair market value of the 60 shares of stock received in excess of that received in exchange for his property as an amount received as compensation for services rendered, and A will realize gain or loss upon the difference between the basis of the 60 shares of stock in his hands and its fair market value.

See also *id.* at 39; S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 50, 264 (1954). Petitioners assert that section 1.351–1(a)(1)(ii) incorporates a proportionate-interest test and that it therefore exceeds the scope of section 351. We disagree. Despite superficial similarities to the "proportionate interest" test, section 1.351–1(a)(1)(ii) is a very different provision.

The "proportionate interest" test was apparently designed to limit the applicability of section 112(b)(5) of the 1939 Code to transactions which did not result in substantial shifts in equity or property interests among the transferor-stockholders. On the other hand, the current regulation appears to be calculated to exclude from the scope of section 351 transactions which would ordinarily fail to meet the 80-percent requirement but which attempt to satisfy it by appending a token exchange of property for stock by one or more persons with stockholdings sufficient to place all of the transferors "in control" of the corporation. We think that the objective of the regulation is considerably narrower than that of the "proportionate interest" test.

The effect of the regulation is also more limited than that of the "proportionate interest" test. Transactions not satisfying the "proportionate interest" test were completely disqualified from nonrecognition treatment under section 112(b)(5) of the 1939 Code. The regulation, on the other hand, disqualifies only particular exchanges by particular stockholders from the scope of section 351 of the 1954 Code; if the remaining transferors can satisfy the 80-percent requirement and otherwise qualify under the statute, the regulation does not prevent them from obtaining nonrecognition treatment.

The uncertainty created by the "proportionate interest" test resulted largely from judicial development of two different tests of proportionality under the statue, and from confusion with regard to application of the tests. Compare *Bodell* v. *Commissioner*, 154 F.2d 407 (C.A. 1) ("relative value" test), affirming a Memorandum Opinion of this Court, and *United Carbon Co.* v. *Commissioner*, 90 F.2d 43 (C.A. 4) ("relative value" test), reversing 32 B.T.A. 1000, with *Mather & Co.* v. *Commissioner*, 171 F.2d 864 (C.A. 3) ("control test"), certiorari denied 337 U.S. 907. See also *Turner Construction Co.* v. *United States*, 364 F.2d 525, 537–538 (C.A. 2); *Uinta Livestock Corp.* v. *United States*, 355 F.2d 761, 768–769 (C.A. 10); *George M. Holstein III*, 23

T.C. 923. Cf. Hoffman, "The Substantial Proportionment Requirement of Section 112(b) (5)," 5 Tax L.Rev. 235. Section 1.351–1(a) (1) (ii), however, provides a clear statement of the comparison to be made; a similar state of uncertainty therefore need not arise. We conclude that congressional elimination of the "proportionate interest" test in 1954 provides no basis for holding the regulation invalid.[4]

Petitioners also contend that the regulation's reference to "property which is relatively small value in comparison to the value of stock or securities already owned" and its reliance upon the taxpayer's motive find support nowhere in the language of section 351 and that the regulation is for that reason invalid as beyond the scope of the statute. Again, we must disagree. By disqualifying certain token exchanges, the regulation is reasonably designed to exclude from the scope of section 351 transactions which comply with its requirements in form but not in substance. Far from being unreasonable or inconsistent with the statute, the regulation promotes its purpose by helping to ensure substantial compliance with the control requirement before the nonrecognition provisions become operative. In this light the absence of direct support for the regulation in the language of the statute is of minimal significance.[5] Cf. *Fabian Tebon, Jr.*, 55 T.C. 410, 412–416. We conclude that the regulation is valid.

(b) *Applicability of the regulation.*—Petitioners contend that even if it is valid, the regulation is inapplicable to the transaction here in issue. They argue first that even if Elizabeth's trust had not purchased shares of International stock, the control requirement would have

---

[4] It is not without significance that regs. sec. 1.351–1(b)(1) expressly takes into account elimination of the "proportionate interest" test:

Sec. 1.351–1 Transfer to corporation controlled by transferor.

(b)(1) Where property is transferred to a corporation by exchange for stock or securities, as described in paragraph (a) of this section it is not required that the stock and securities received by each be substantially in proportion to his interest in the property immediately prior to the transfer. However, where the stock and securities are received in disproportion to such interest, the entire transaction will be given tax effect in accordance with its true nature, and in appropriate cases the transaction may be treated as if the stock and securities had first been received in proportion and then some of such stock and securities had been used to make gifts (section 2501 and following), to pay compensation (section 61(a)(1)), or to satisfy obligations of the transferor of any kind.

The regulation scrupulously adheres to the language of the 1954 committee reports. See pp. 862–863 *supra.* As a companion provision to regs. sec. 1.351–1(a)(1)(ii), it provides additional support for our conclusion.

[5] Petitioners rely upon *Gus Russell, Inc.*, 36 T.C. 965, 969, and *Pocatello Coca-Cola Bottling Co.* v. *United States*, 139 F. Supp. 912, 915 (E.D. Idaho), for the proposition that the intention of the parties has no bearing on the applicability of sec. 351. See also *George A. Nye*, 50 T.C. 203, 209 ; *Miller Bros. Electric, Inc.*, 49 T.C. 446, 451. Although there are statements to this effect in each of the foregoing opinions, they were made in the context of transactions which were of the sort contemplated by sec. 351 and which did not involve a token exchange of property for stock by one or more stockholders. The statements were not made in reference to regs. sec. 1.351–1(a)(1)(ii), and we think they have little relevance here.

been satisfied, that therefore the purchase was not necessary to meet the control requirement, and that consequently the regulation is by its own terms inapplicable. Petitioners reach this conclusion by asserting that the shares held by Becka and Lisbeth Godley as trustees of Elizabeth's trust should be attributed to them as individuals [6] and added to the shares they held personally in nonfiduciary capacities. On the basis of this premise, petitioners conclude that the 80-percent-control requirement would have been satisfied even if Elizabeth's trust had not participated in the September 1, 1965, transaction.[7] Petitioners' argument is ingenious but unacceptable, for it falters on petitioners' premise that the trust's shares may be attributed to the individual trustees. While legal title to the shares may have been in the names of the trustees, they had no beneficial interest in such shares. The distinction is not one of form but of plain economic reality.[8] In these circumstances we think the trustees' interests in the trust's shares were far too remote to justify attributing the shares to them for purposes of section 351.[9]

Petitioners also contend that the primary purpose for the trust's acquisition of International's stock was not to qualify the other stockholders' exchanges under section 351 and that for this reason the regulation is inapplicable. We note at the outset that the regulation does not make it entirely clear *whose* purpose is to be taken into account. However, both parties have assumed that the purpose of the transferor of property is critical. The language of the regulation (which

---

[6] As authority for their position petitioners cite only 1 Scott, Law of Trusts 6 (3d ed. 1967) for the proposition that a trustee of property is the "owner" thereof.

[7] A table in petitioners' brief summarizes their argument:

| | Shares of class A | Shares of class B | Percentage of each class |
|---|---|---|---|
| Lisbeth (Kamborian) Godley and Michael Becka [1] | 9,000 | 81,002 | 22.83 ⎫ |
| Jacob S. Kamborian Revocable Trust | 22,108 | 198,971 | 56.07 ⎬ 90.0 |
| Jacob S. Kamborian, Jr | 4,403 | 39,627 | 11.17 ⎭ |
| Others | 3,116 | 35,244 | 9.93 |
| | 39,427 | 354,844 | 100.00 |

[1] The figures reflect the actual amount held by Godley and Becka individually after the September 1 transaction, plus the amount of shares held by the Elizabeth Kamborian Trust prior to the transaction.

[8] Cf. *Portland Oil Co.* v. *Commissioner*, 109 F. 2d 479, 488 (C.A. 1), certiorari denied 310 U.S. 650, where the court said:
"It is the purpose of * * * [sec. 351] to save the taxpayer from an immediate recognition of a gain, or to intermit the claim of a loss, in certain transactions where gain or loss may have accrued in a constitutional sense, but where in a popular and economic sense there has been a mere change in the form of ownership and the taxpayer has not really 'cashed in' on the theoretical gain, or closed out a losing venture. * * *"

[9] We need not decide whether the trust's shares may be attributed to its beneficiaries. Compare *Commissioner* v. *National Bellas Hess, Inc.*, 220 F. 2d 415, 420 (C.A. 8), affirming 20 T.C. 636, 646; *Griswold Co.*, 33 B.T.A. 537, 542–544, and *Ridgewood Cemetery Co.*, 26 B.T.A. 626, 629–630, with sec. 7701(a), I.R.C. 1954, regs. sec. 1.351–1(a), and *Maximov* v. *United States*, 373 U.S. 49, 51–53.

appears to distinguish between a "transfer" of property and the issuance of stock) supports their assumption, and we shall therefore proceed on this basis. Although Elizabeth's trust was technically the transferor herein, the parties have also assumed that Becka's purpose is critical in this respect—apparently on the ground that as the managing trustee he was primarily responsible for the decision to make the purchase of International stock. We shall proceed on the basis of this assumption as well.

The question of Becka's primary purpose is one of fact, cf. *Malat* v. *Riddell*, 383 U.S. 569, and after a review of all the evidence we conclude that his primary purpose was to qualify the other stockholders' exchanges under section 351. We note in particular that at about the time of the transaction, Jacob was ill and Becka was in charge of International's affairs, that in planning the acquisition Becka participated in lengthy discussions with regard to planning the transaction as a tax-free exchange, and that both the vote of International's board of directors and the agreement of September 1, 1965, treated the purchase by Elizabeth's trust and the exchange of Campex stock by the other stockholders as component parts of an integrated transaction avowedly designed to meet the 80-percent-control requirement and thereby qualify for nonrecognition treatment under section 351.

At the trial herein, Becka testified that if the trust had not participated in the transaction, the issue of International stock to the other major stockholders would have diluted the trust's percentage interest in International and that he authorized the purchase of International stock in order to minimize such dilution. In particular he testified that the total percentage stock interest held by the trust and the two Kamborian children exceeded 33⅓ percent and that preservation of that interest protected Mrs. Kamborian against the making of certain corporate decisions (requiring a two-thirds majority) without her consent.[10] We do not give his testimony very much weight, however. The record does not establish whether or why the children were regarded as allies of Mrs. Kamborian rather than as allies of her husband. Moreover, the trust's participation in the transaction left them with an aggregate stock interest of 33.57 percent—only 0.08 of 1 percent more than they would have held if the trust had not purchased any additional shares.

Becka also testified that he authorized the purchase of the stock because it was a "good investment." While he may well have taken this into account in making his decision, the record leaves us convinced that the purchase was made primarily to qualify the exchanges by the

[10] See Mass. Gen. Laws, ch. 156B, secs. 71, 75, and 78 (1970).

other stockholders (one of whom was Becka himself)[11] under section 351. We conclude that section 1.351–1(a)(1)(ii) is applicable.

(c) *Fair market value of the International stock.*—The Commissioner determined that the fair market value of the International stock received by petitioners was $16.20 per share. His determination did not distinguish between shares of class A (voting) and class B (nonvoting) stock. In their petitions herein, the taxpayers claimed that the fair market value of the stock did not exceed $12 per share. We have found as a fact that as of September 1, 1965, the fair market value of International's class A stock was $13 per share and that the fair market value of its class B stock was $12.50 per share.

At the trial herein, the Commissioner presented an expert witness who testified that the fair market value of the class A stock was $15.50 per share and that the fair market value of the class B stock was $15 per share. Petitioners also presented an expert witness; he testified that the fair market value of the stock was $11.50 per share and made no distinction for these purposes between the two classes of stock.

The discrepancy between the conclusions of the witnesses stems largely from their differing treatment of the restrictions on the transfer of the International stock. The restrictions were set forth in detail in our findings and required in general that no share of International's common stock could be transferred until the holder had first offered the share for sale to the corporation at the share's book value as of the end of the corporation's most recent fiscal year. The restrictions could be waived by a vote of two-thirds of the stockholders. As of December 31, 1964, the book value of International's stock was $10.29.

In making his valuaton, the Commissioner's witness gave no weight to the restrictions on the ground that they could be waived by a vote of two-thirds of the stockholders. On the other hand, petitioners' witness took the restrictions into account but gave no weight to the ability of the stockholders to waive them, and little or no weight to the possibility that International would eliminate the restrictions in making a

---

[11] The following excerpt from Becka's testimony reflects the ambiguity created by his multiple roles as stockholder, officer, and director of International, participant in the exchange with International, and trustee of Elizabeth's trust:

Q. And where did you say you obtained the money to purchase [the shares on behalf of Elizabeth's trust]?
A. I borrowed it from the National Shawmut Bank.
Q. And did you—what security did you give for that borrowing?
A. No. No particular security, just the—.
Q. They loaned you $5000 on your signature—
A. Yes.
Q. —as trustee?
A. Yes. They were also acting for some other banking transaction for us and all—
Q. Who do you mean by "us"?
A. By the various businesses in which International was involved.

public issue of its common stock. We think that in determining the fair market value of International's stock, all of the foregoing considerations must be taken into account. Clearly, the requirement that a stockholder must first offer stock for sale to International at its book value would limit what a purchaser would pay for the stock in the first place.[12] But it is also true that the possibility that the stockholders might waive or eliminate the restrictions would tend to mitigate the effect of that requirement. See *Estate of Pearl Gibbons Reynolds*, 55 T.C. 172,.188–195, and cases cited therein. On the basis of all the evidence of record, we have made a finding that as of September 1, 1965, the fair market value of the class A stock was $13 per share and the fair market value of the class B stock was $12.50 per share.

2. *Short-term capital loss.*—Petitioners Jacob and Elizabeth Kamborian contend that Jacob gave $50,000 to his son, Jacob, Jr., to lend to or invest in U.S.M.C., that Jacob, Jr., served as a conduit in this respect and made the loan or investment on his father's behalf, and that the loan or investment became worthless in 1966. The parties are in agreement that it makes no difference for purposes of computing Jacob and Elizabeth's tax whether the advance was in the nature of a loan or a capital investment.[13] Moreover, they have stipulated that in 1966 U.S.M.C. became insolvent and unable to pay any of its debts. The Commissioner's position is simply that petitioners have failed to prove the existence of a debt or equity relationship running between U.S.M.C. and Jacob. In particular, he urges that petitioners have failed to establish the nature of the understanding between Jacob and his son at the time the advance was made and have also failed to estab-

---

[12] Both experts agreed that the stock's book value of $10.29 per share as of Dec. 31, 1964, did not establish an absolute limit on the fair market value of the shares. Since the restrictions provided for annual recomputation of book value, a prospective purchaser would certainly take into account any anticipated increases in book value in determining what he would pay for the stock.

[13] Cf. sec. 166(d)(1)(B), I.R.C. 1954:

SEC. 166. BAD DEBTS.

    (d) NONBUSINESS DEBTS.—

        (1) GENERAL RULE.—In the case of a taxpayer other than a corporation—

        \*        \*        \*        \*        \*        \*        ✦

        (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.

Sec. 165(f), (g)(1), I.R.C. 1954:

SEC. 165. LOSSES.

    (f) CAPITAL LOSSES.—Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212.

    (g) WORTHLESS SECURITIES.—

        (1) GENERAL RULE.—If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset.

lish Jacob, Jr.'s disposition of the funds advanced to him. We agree with the Commissioner.

The arrangement between Jacob and his son was oral, and the record leaves us with great doubt as to what that arrangement was. It is quite probable on the record that Jacob merely made a loan to his son, and that Jacob himself made no investment either as a creditor or as a stockholder in U.S.M.C. Jacob was the only witness to testify with regard to this issue. Jacob, Jr., who could have given us a more complete picture of the nature of the understanding between father and son and who was probably better informed than anyone else with regard to what was done with the $50,000, was not called as a witness. Moreover, the books and records of U.S.M.C., which might have cast some light on whether it received the funds and whether Jacob (rather than his son) was treated therein as having made the advance, were not produced. The burden of proof is upon petitioners and we cannot assume that the missing evidence would have been favorable to them. See *Jean V. Kresser*, 54 T.C. 1621, 1630; *Samuel Pollack*, 47 T.C. 92, 108, affirmed 392 F. 2d 409 (C.A. 5); cf. *Wichita Terminal Elevator Co.*, 6 T.C. 1158, 1165, affirmed 162 F. 2d 513 (C.A. 10). On this state of the record we hold that petitioners have failed to establish that they are entitled to the deduction. For aught we know the substance of the transaction was merely a loan between father and son with the understanding that the son would invest the funds in U.S.M.C. on his own behalf—without establishing any creditor or stockholder relationship between Jacob and U.S.M.C.[14]

*Decisions will be entered under Rule 50.*

---

[14] Cf. *Francesco Gaglione*, 28 T.C.M. 1024, 1030, P–H. Memo. 69–1109, 69–1116.