MARILAN SHIH-HSIEH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Shih-Hsieh v. Commissioner
Docket No. 6995-79.
United States Tax Court
T.C. Memo 1986-525; 1986 Tax Ct. Memo LEXIS 83; 52 T.C.M. (CCH) 881; T.C.M. (RIA) 86525; October 22, 1986. Marilan Shih-Hsieh, pro se. Jack H. Klinghoffer and Moira L. Sullivan, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined deficiencies in and additions to petitioner's 1969 and 1970 Federal income tax as follows: Addition to Tax
Year
Deficiency
Sec. 6653(b) [1]
1969
$540,530
$270,265
1970
26,677
13,339
The issues for decision are whether section 6501 bars the assessment of tax for the years at issue; if not, whether petitioner had unreported income in the amounts determined by respondent and whether any part of the underpayment of tax for 1969 or 1970, if any, was due to fraud. For convenience, we have combined our findings of fact and opinion by issues. Some of the facts were stipulated and by this reference we incorporate herein the *85 stipulation. Petitioner resided in New York City when she filed her petition. Statute of Limitations
Petitioner argues that she may not be assessed a deficiency so long after the tax years at issue. On March 12, 1973, petitioner submitted to respondent unsigned Forms 1040 covering 1969 and 1970. She submitted no other returns covering the years in issue. On March 1, 1979, respondent sent petitioner a statutory notice of deficiency determining deficiencies and additions for 1969 and 1970. The assessment of a tax must ordinarily be made within three years after the return is filed. Sec. 6501(a). When no return has been filed, however, assessment may be made at any time. Sec. 6501(c)(3); sec. 301.6501(c)-1(c), Proced. & Admin. Regs. A return neither sworn to nor signed is treated as no return at all for purposes of the limitations period. Lucas v. Pilliod Lumber Co.,281 U.S. 245 (1930); Kalb v. United States,505 F.2d 506, 508-509 (2d Cir. 1974), cert. denied 421 U.S. 979 (1975); Cupp v. Commissioner,65 T.C. 68, 78-79 (1975), *86 affd. without published opinion 559 F.2d 1207 (3d Cir. 1977). Here, it is uncontested that the only returns petitioner submitted for the years at issue were unsigned. The statute of limitations never began running. Assessment against petitioner is not barred. Income Tax Deficiencies
The next issue for decision is whether and to what extent petitioner had unreported income during the 1969 and 1970 taxable years. The notice of deficiency is presumptively correct, and petitioner bears the burden of proving otherwise. Rule 142(a). During the years in issue petitioner, a self-described immigrant with a fifth grade education, was a single parent of several children, at least three of whom lived with her as her dependents. [2] She had no job and received no alimony or child support. Despite the lack of any visible means of support, petitioner owned and lived in a luxurious penthouse apartment on Fifth Avenue. [3] During the years in issue she travelled to the Bahamas, Geneva, London, Zurich, Rome, Manila, Hong Kong, and Tokyo, as well as throughout the United States. Funds *87 for petitioner's transportation to and expenses in Las Vegas and the Bahamas were provided by casinos where she and her children were treated royally. [4]
Petitioner socialized with the rich and famous, and claimed to be acquainted with Prince Sihanouk, Prince Souvana Phouma, and Mao Tse-tung. Petitioner showed one witness a letter in Chinese characters, purportedly from the Chinese Embassy in Canada, which petitioner asserted thanked her for her help in normalizing relations between Canada and Red China. The evidence shows that petitioner spent $651,550 at Las Vegas casinos in 1969 and made large bank deposits during 1969 and 1970. In 1969 petitioner made bank *88 deposits of $243,927.89. She used separate funds to purchase cashiers' checks from New York and Suburban Federal Savings & Loan Association in the amounts of $30,000 and $20,000, payable to Bahamas Amusement and Caesar's Palace, respectively. The bank deposits, cashiers' checks, and Las Vegas casino expenditures total $945,477.89. Unreported interest brings the total to $945,701.89. Respondent concedes $32,597 of petitioner's 1969 bank deposits came from nontaxable sources (interbank transfers and loans). Respondent also concedes that $179,150 of the amount spent at casinos came from the bank deposits and should be subtracted from the total as a duplication, and we so find. We further find that the $20,000 cashier's check payable to Caesar's Palace is a duplication of the Las Vegas expenditures. [5]
*89 Petitioner is thus presumed to have $713,954.89 in taxable income in 1969. The burden is on petitioner to prove otherwise by a preponderance of the evidence. In 1970 petitioner made bank deposits of $146,706.35. Respondent also contends petitioner purchased with cash an unidentified cashier's check in the amount of $25,000. [6] Of the total, respondent concedes $105,500 was from nontaxable sources, but contends the remaining $66,206.35 is from taxable sources. A taxpayer is required to maintain records sufficient to show whether or not he is liable for Federal income taxes. Sec. 6001. Petitioner has not presented sufficient records to permit an accurate computation of her income tax liability for the years in issue.It is well established that where the taxpayer fails to maintain adequate records, the Commissioner may prove the existence and amount of unreported income by any method that will, in his opinion, clearly reflect the taxpayer's income. Sec. 446(b); Holland v. United States,348 U.S. 121, 130-132 (1954); Harper v. Commissioner,54 T.C. 1121 (1970). *90 For 1970, respondent used the bank deposits income reconstruction method, a long-accepted method of reconstructing a taxpayer's income. Nicholas v. Commissioner,70 T.C. 1057, 1065 (1978); Estate of Mason v. Commissioner,64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977). The premise underlying this reconstruction method is that, absent some explanation, a taxpayer's bank deposits represent taxable income. The total of all deposits is determined by the Commissioner for the year in question to arrive at the taxpayer's gross income. An adjustment is then made to eliminate deposits that reflect non-income items such as gifts, loans, and transfers between the taxpayer's various bank accounts.The Commissioner will also make a further adjustment for the taxpayer's ascertainable business expenses, deductions, and exemptions. See Percifield v. United States,241 F.2d 225 (9th Cir. 1957). For 1969, respondent used a variation of the bank deposits method whereby the taxpayer's cash expenditures are added to his bank deposits in order to determine gross income. Gromacki v. Commissioner,361 F.2d 727, 728-729 (7th Cir. 1966); *91 Harper v. Commissioner,supra at 1129. [7]
Where respondent has employed these methods in his determination of the deficiencies, the burden of proof rests with petitioner to show that such determination was erroneous. Rule 142(a); Estate of Mason v. Commissioner,supra at 657; Harper v. Commissioner,supra at 1129. The Commissioner need not prove a likely source for the unreported income, Tokarski v. Commissioner, 87 T.C.     (July 14, 1986), Estate of Mason v. Commissioner,supra at 657, nor is he required to prove that all deposits constitute taxable income. Gemma v. Commissioner,46 T.C. 821, 833 (1966). The burden of showing duplications is on the taxpayer. Zarnow v. Commissioner,48 T.C. 213, 216 (1967). *92 [8]
Petitioner concedes she failed to report $224 in interest income for 1969. Respondent concedes petitioner is entitled to 1969 deductions of $3,167 and exemptions of $3,000, and 1970 deductions of $3,218 and exemptions of $3,125. Petitioner contends the money reflected in the bank deposits, cashiers checks and cash expenditures came from selling jewelry and from loans.Respondent conceded in the deficiency notice that in 1969 petitioner borrowed $30,000 from Alfred Harris and that $2,597 was an interbank transfer. Respondent also agrees that in 1970 petitioner received an insurance loan of $5,500, a $50,000 loan from Charles Gross, and a $50,000 refund on the purchase of a Tangier villa. Respondent contends the remainder is taxable income. Petitioner's only evidence regarding the sale of jewelry was a 1958 $12,000 appraisal of a platinum and diamond bracelet, and her oral testimony that she sold it in either 1969 or 1970. She was unable to recall either the buyer or the purchase price. This evidence is too inconclusive to support a finding. Petitioner argues her gambling money was supplied *93 by casinos as "trust accounts." In support she introduced markers totalling $426,000. Many have no date or a date outside the years in issue. More importantly petitioner admitted that all the markers were paid off (which is why they were returned to her) as she gambled or soon after. Petitioner said she paid off her markers from winnings, usually in chips. Her thesis seems to be that she always broke even. However, respondent's investigating agent examined the accounting records of seven casinos. The records indicated whether petitioner's payments were in cash, check or casino chips. The agent testified he did not include payments made by petitioner in chips as unreported income.The parties stipulated petitioner made payments to casinos in these forms: Cash - $481,650 Check - $107,400 Unidentified - $62,500 The "unidentified" category was never explained, but respondent credited petitioner with $179,150 in payments coming from the bank deposits. The "check" and "unidentified" payments add up to $169,900, so it appears petitioner has already received the benefit of the doubt regarding unidentified payments. Thus, the markers introduced as evidence by petitioner do not *94 tend to show anything not already stipulated. Petitioner testified she borrowed large amounts from friends, but her testimony was vague. She could not provide promissory notes or other documentary evidence of such loans, nor did she recall with specificity dates, amounts borrowed, or names of creditors. Respondent's witnesses, however, were more helpful to petitioner on this point. Respondent relies on the testimony of Judge Ruben Sirlin, co-executor of the estate of one Harry Crown, to show petitioner obtained $45,000 in a gold scam. The testimony, however, supports petitioner's position that the money was a loan. On direct examination, respondent asked Sirlin: Q. Did there come a time when Harry Crown said something to you about gold transactions that he was contemplating? A. No he did not discuss any gold transactions. He discussed the fact that he had given $45,000 [9] in different notes to Mrs. Shih-Hsieh she said it was to be for the purchase of gold. After Crown died, petitioner voluntarily repaid $10,000. Sirlin then sued her on the notes. Petitioner never said anything to Sirlin about gold. On cross-examination, Sirlin testified: Q. . . . [D]id you inform *95 [the IRS agents] that a $40,000 gold swindle was perpetrated by me against Mr. Crown? A. I never mentioned that at all. * * * Q. Mr. Sirlin, did Mr. Crown ever tell you that voluntarily I gave the legal notes and blank signed checks to Mr. Crown? A. He told me those notes were for security for the loan that he had made you. It seems likely that Crown loaned petitioner $40,000 and we so find. Petitioner testified she also received personal loans from a Charles Gross and personal and insurance loans from her insurance agent, Alfred Harris, during the years in issue.Respondent stipulated that petitioner incurred nontaxable loans from Harris in the amount of $30,000 in 1969, an insurance loan of $5,500 in 1970, and a $50,000 loan from Gross in 1970. Gross, a long-time close, personal friend, loaned petitioner a total of $220,000 in 1970 and 1971 "for personal reasons." However, no evidence was introduced to support a finding that petitioner borrowed more *96 than $50,000 from Gross in 1970. At trial Gross testified that petitioner repaid all but $105,000. After petitioner's repayment check in that amount was returned for insufficient funds he sued her but did not collect. He said he still has "a naive hope" of being repaid. [10]
*97 Respondent seeks to characterize these loans as "swindling income" on the theory that petitioner never intended to repay them. Respondent cites an affidavit dated June 10, 1983, wherein petitioner asserted her liabilities were only $1,000.00 on that date. The affidavit was given in support of a $200,000 mortgage loan on her apartment. Respondent points out the conflict between this statement and petitioner's testimony on the stand that she now owes over $1,000,000, and that she fully intends to repay her debts. We think respondent seeks to prove too much with too little. Petitioner may have lied on her mortgage application in 1983. Alternatively, she may not have intended in 1983 and may not now intend to repay her debts. [11] However, we believe petitioner did intend repayment when the loans were made. Her creditors had known her over many years and were personal friends. Indeed, she repaid the $40,000 Crown loan with interest, $10,000 voluntarily and the rest after his executor obtained a judgment. She also repaid $115,000 of the loans from Gross. Respondent stipulated that $50,000 from Gross was nontaxable as well as $30,000 from Abrams, and we so find. Respondent has *98 not explained why these loans are legitimate but others are "swindling" income. We find that the $40,000 from Crown was a nontaxable loan as well. [12] See Johnson v. Commissioner,48 T.C. 636, 640 (1967). Petitioner has not met her burden of establishing that the remaining bank deposits and expenditures emanated from nontaxable sources. We thus find that petitioner had income during the years in issue as follows: 1969
Bank deposits
$243,927.89
Cashiers' checks purchased
with cash
50,000.00
Casino payments
651,550.00
Interest
224.00
$945,701.89
Less nontaxable sources: Bank transfers
2,597
Harris loans
30,000
Casino payments
from bank accts.
179,150
Casino payments
from cashier's check
20,000
231,747.00
Gross income
$713,954.89
Less: Stipulated deductions
3,167
Exemptions
3,000
6,167.00
Taxable income
$707,787.89
1970
Bank deposits
$146,706.35
Cashier's check purchased
with cash
[13] 25,000.00
$171,706.35
Less nontaxable sources: Life ins. loan
5,500
Gross loan
50,000
Refund on Tangier
villa
50,000
Crown loan
40,000
145,500.00
Gross income
$26,206.35
Less: Stipulated deductions
3,218
Exemptions
3,125
6,343.00
Taxable income
$19,863.35
*99 Fraud
Section 6653(b)[14] provides, in part, that "[i]f any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment." Respondent bears the burden of proving by clear and convincing evidence that petitioner has an underpayment, and that some part of this underpayment is due to fraud. Sec. 7454(a); [15]Rule 142(a); e.g., Stone v. Commissioner,56 T.C. 213, 220 (1970); Otsuki v. Commissioner,53 T.C. 96, 105 (1969). Thus, the addition to tax under section 6653(b) presumes the existence of an "underpayment." In the absence of such an underpayment, there is nothing upon which the fraud addition to tax would attach. *100 Jenkins v. UnitedStates,313 F.2d 624, 627 (5th Cir. 1963). [16]
*101 Affirmative proof of an underpayment is a necessary element of the Commissioner's burden of proof. To prove an underpayment, respondent is not required to establish the precise amount of the deficiency determined by him. However, the Commissioner cannot satisfy his burden by relying solely on petitioner's failure to discharge her burden of proving error in his determination of the deficiency. Otsuki v. Commissioner,53 T.C. 96, 106 (1969); Pigman v. Commissioner,31 T.C. 356, 370 (1958). Pursuant to the entire underpayment even though only a portion of it is actually attributable to the fraud. Mensik v. Commissioner,328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962); Breman v. Commissioner,66 T.C. 61 (1976); Stewart v. Commissioner,66 T.C. 54 (1976). The issue of fraud poses a factual question which is to be decided on an examination of all the evidence in the record. Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972), *102 affg. a Memorandum Opinion of this Court; [17]Mensik v. Commissioner,328 F.2d 147 (7th Cir. 1964), affg. 37 T.C. 703 (1962); Stone v. Commissioner,56 T.C. at 224; Stratton v. Commissioner,54 T.C. 255, 284 (1970). Fraud is an actual intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. E.g., Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; [18]Powell v. Granquist,252 F.2d 56, 60 (9th Cir. 1958); Estate of Pittard v. Commissioner,69 T.C. 391, 400 (1977); McGee v. Commissioner,61 T.C. 249, 256-257 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). For 1970, we found taxable income of $19,863.35. After taking into account the $25,000 check on which respondent offered no proof, see n. 13, above, petitioner's proof and respondent's concessions more than wiped out the balance of the determined taxable income. Since respondent did not affirmatively *103 prove an underpayment for 1970, we find no fraud in that year. Although we found that petitioner had taxable income of $707,787.89 in 1969, we decided this solely on petitioner's failure of proof. We must now examine whether respondent has independently established by clear and convincing proof that a portion of the bank deposits and expenditures for 1969 is taxable income. We conclude that respondent has not met this heavy burden. Fraud is never imputed or presumed and courts should not sustain findings of fraud upon circumstances which at most create only suspicion. Olinger v. Commissioner,234 F.2d 823, 824 (5th Cir. 1956); Davis v. Commissioner,184 F.2d 86, 87 (10th Cir. 1950); Green v. Commissioner,66 T.C. 538, 550 (1976). Respondent contends petitioner was a swindler. Specifically, respondent attempted to prove petitioner earned her income by false pretenses in that she (1) borrowed money never intending to repay it and (2) "sold" nonexistent gold bullion purportedly smuggled into this country from China. We have already *104 rejected respondent's theory that loans received by petitioner in 1969 were swindling income, and we will not repeat ourselves. Respondent also claims petitioner pretended to own gold bullion, smuggled into the United States from China; that the induced would-be buyers to give her money; and that she kept the money but never produced any gold. If proven, such proceeds would be taxable income to petitioner. James v. United States,366 U.S. 213 (1961); Rutkin v. United States,343 U.S. 130 (1952); United States v. Rochelle,384 F.2d 784, 781 (5th Cir. 1962), cert. denied 390 U.S. 946 (1968); Peters v. Commissioner,51 T.C. 226 (1968). Respondent's evidence consists of the testimony of three witnesses, Judge Ruben Sirlin, Mitchell Wilkins and Eugene ("Mac") Bowen. We discussed Sirlin's testimony above and concluded it does not tend to establish that petitioner had income from a gold swindle. Wilkins testified as follows: Around April of 1970 his then father-in-law, Dr. David Elman introduced him to one Ernesto (a/k/a Ernest) Keiser to talk about investing Wilkins' recent inheritance. A few *105 weeks later Wilkins, Elman, Keiser and petitioner met at the Sherry Netherlands Hotel. Petitioner claimed to have $6,000,000 worth of gold she wanted to sell at around $32.00 an ounce. Wilkins said, "I wasn't going to do the actual buying, I was just going to give my father-in-law some money and he promised me a very nice return in a couple of weeks." The return promised was $10,000. Wilkins put up $58,000 cash, [19] his inheritance. The money was not paid back as promised. Dr. Elman eventually repaid Wilkins $48,000 or $48,500, and Wilkins sued Elman for the rest. He never recovered because Dr. Elman went bankrupt. Wilkins never did any business directly with petitioner nor did he give her any money. On cross-examination Wilkins denied it could have been Keiser instead of petitioner who talked about the gold. He said, "[Y]ou couldn't have just sat back there as just somebody sipping a drink and denying that we were talking about $6,000,000 worth of gold. Mr. Keiser was an intermediary. Dr. Elman was an intermediary." As impeachment evidence, *106 petitioner introduced a New York Post news article dated December 4, 1984 about Keiser, which was received over respondent's relevancy objection. According to the clipping Keiser was shot and wounded outside a suburban Washington, D.C. restaurant. He was allegedly put on a hit list after helping lure fugitive ex-CIA agent Edwin Wilson back to the United States from Libya. Keiser was to have gone on trial the following day "on a charge of having obtained about $450,000 from someone in New York by various false representations." Petitioner argues that Keiser was the swindler, not herself. Eugene S. "Mac" Bowen identified himself as a "field agent for an organization called International Armament Corporation." He testified as follows: Bowen met Elman in 1970. Bowen had an overseas client (an Egyptian doctor), who represented large Arab oil interests in the United States and wanted to buy gold and oil for his overseas accounts. Elman set up a meeting in late spring of 1970 attended by Bowen, Keiser, Elman and petitioner. In this and later meetings petitioner asked Bowen to help her sell 276 gold bars weighing 22 pounds each. She offered him a commission of $1.00 per ounce. The *107 gold was stored in a Manhattan bank. Bowen could inspect and test it.Petitioner would sell it in bulk for $32.00 an ounce, cash, which would be in excess of $6,000,000. Petitioner wanted the gold removed from the United States. Bowen offered to place the money in escrow as long as he received legal export documents from the United States Department of Customs, but petitioner refused since the gold had been smuggled in and would have to be smuggled out. Petitioner preferred an escrow account in a Swiss bank but would accept escrow against shipping documents or cash in a suitcase brought to the vault in a simultaneous exchange. Bowen then contacted the U.S. Customs Service in New York, which initially offered him $50,000 upon recovery of the gold, but without further investigation referred him to the Secret Service. A secret service agent accompanied Bowen to his third meeting with petitioner, this time at her apartment, posing as Bowen's attorney. Petitioner agreed to sell one or two bars for testing. The Secret Service, however, did not pursue the investigation, but referred Bowen to the F.B.I. That agency had no interest either. Bowen never received a reward because "they *108 could never absolutely, positively ascertain where indeed this gold was and the Customs job was not enforcing gold bullion storage laws, their job was enforcing, obviously, entry and exit into the United States." In support of his testimony that he and petitioner had been on friendly terms, Bowen identified a postcard from petitioner dated October 14, 1971 from Iran. It reads: "Dear Mac: Here I am in Persia. Fabulous Celebration! Next Singapore and then Phillipines [sic] - Then Peking via Hong Kong! Keep healthy, happy and prosperous. Will return soon. M.S.H." Petitioner acknowledged the card bore her signature. Bowen never gave petitioner any money. He broke off negotiations with her when the Federal law enforcement agencies lost interest. In rebuttal, petitioner called Dr. David Elman, a witness originally subpoenaed but not called by respondent. Elman was in the courtroom when Wilkins and Bowen testified, and when respondent's investigating agent Cox said Elman told him petitioner perpetrated a gold swindle. On direct examination, Elman testified as follows: Q. Doctor Elman, did you ever at any time tell the team of Vergara and Cox [IRS Special Agents] that *109 Marilan Shih-Hsieh perpetrated a gold swindle? A. I never said any such thing in my life. If I did I must have been out of my mind. I never, never said anything like that. Never, never. Q. Thank you sir. A. You never swindled me, why should I say that? Elman emphatically denied he introduced petitioner to Bowen and swore he did not even know petitioner when he met Bowen. He testified: * * * I called you after I had gotten in severe difficulty with Mr. Keiser and I was wiped out and I called you for the specific purpose of you trying to help me locate Mr. Keiser and Mr. Smiley who had absconded with practically everything that I had, and you consented to meet me at a restaurant in New York and that was the first time we met. This was two or three years after all of this situation. Up to that time, I never knew you. I never knew you. THE COURT: But you are sure that you did not meet Mr. Bowen until -- you never introduced Mr. Bowen and Mrs. Shih-Hsieh, is that what you are saying? THE WITNESS: Never, never. Never happened. Elman said he knew Bowen for only a short time and that the only business he had with Bowen was to cash a $500.00 check for Bowen, which *110 bounced. It took six months to get his money back and then it was only with the help of the police. Elman said he never did any business with petitioner, although she once tried to borrow $25,000, offering to put up her apartment as security. He did not have the money because of his financial troubles with Keiser, but would have loaned it to her if he could have. Elman still feels friendly to petitioner because she tried to help him. Elman categorically stated: "I never saw one piece of gold. I never asked for one piece of gold. She never tried to sell me any gold. I said that a hundred times now." Elman's recollection of Wilkins' involvement also contradicted Wilkins' testimony. Elman said it started with a dinner at Elman's house with a Peter Smiley from the Bahamas, Wilkins, Elman's daughter and Elman's wife. (Although he did not explicitly say so, Elman's testimony also conflicted with Wilkins' statement that Elman introduced Wilkins to petitioner, since Elman could not have known her in 1970.) Elman regretted Wilkins' losing his money. Although he did not feel he owed it, and was in severe financial trouble himself, he repaid Wilkins everything Elman had ($48,000) *111 in hopes of saving his daughter's marriage, but the marriage failed. Elman sought out petitioner later because he thought she might help him locate Keiser, when Elman wanted to sue. He had heard a rumor that petitioner had a romantic relationship with Keiser. He had also heard rumors about petitioner and gold, but, he testified, "I knew nothing about -- they are all rumors. I never saw anything and nobody tried to sell me anything and I didn't try to buy anything." In rebuttal, respondent called Mary Vergara, an IRS Special Agent, to authenticate a memorandum of conference dated November 21, 1973. It purports to be a summary of an interview with Elman, but was signed only by agents Cox and Vergara. The report substantially verifies, rather than contradicts, Elman's testimony. In it Elman purportedly stated he was approached by Keiser and Smiley; that Keiser told him about Shih-Hsieh; that Keiser insisted on Elman's giving him $58,000; that Elman persuaded Wilkins to give Keiser the cash. According to the statement, he met petitioner only after Elman had made further investments with Keiser, had persuaded other friends to invest and lose their money, and had found himself *112 heavily in debt as a result. The report does not give a date of Keiser's first meeting with petitioner, but says rather enigmatically, "Sometime after Elman began to suspect the sale of gold would not be consummated, Elman telephoned Marilan Shih Hsieh and invited her out to dinner." (Emphasis added.) This dinner must have been their first meeting, since the report continues: They went to the Quo Vadis on 5th Ave., and Elman explained the circumstances surrounding the $58,000 deal. Mrs. Shih Hsieh denied ever having [sic] received the $58,000. Elman would not have needed to explain the circumstances if he and Wilkins had been talked into the "investment" by petitioner, rather than by Keiser. The only portion of the entire IRS report inconsistent with Elman's in-court testimony consists of the following sentences: Dr. Elman said he then began to negotiate again for the purchase of the gold from Mrs. Shih Hsieh and had persuaded a friend, Mack Bowen to come from Carmel, Indiana, to appeal to Mrs. Shih Hsieh. Elman said there were several meeting [sic] between Shih Hsieh, Bowen, and [sic] undercover Customs Agent, and Philip Reddock (introduced as PR) at one meeting *113 but negotiations broke off for unknown reasons and Elman never did get to see any of the gold bars. This portion of the Internal Revenue Service statement conflicts not only with Elman's and petitioner's testimony but also with that of respondent's witness, Bowen, who said he only met for one half-hour with petitioner and the undercover agent, and that no one else was present. Bowen also described a 3 person dinner with himself, Reddock and petitioner, again with no one else present. Elman's statement was not signed or adopted by him, was introduced for impeachment purposes only, and we therefore do not give the inconsistent portion any weight. We note initially that the events described by Wilkins and Bowen occurred in 1970, a year in which we have found no fraud.There is no evidence that similar activities occurred in 1969 or that the events in 1970 were a continuation of earlier activities. We decline to make such an inference. In discharging our ultimate duty as trier of the facts -- the "distillation of truth from falsehood which is the daily grist of judicial life," Diaz v. Commissioner,58 T.C. 560, 562 (1972) -- we carefully evaluated the credibility *114 of the witnesses, whom we saw and whose demeanor we observed. In making such evaluation, we are not compelled to accept any testimony as gospel, see Gerardo v. Commissioner,552 F.2d 549, 553 (3d Cir. 1977); Wood v. Commissioner,338 F.2d 602 (9th Cir. 1964), affg. 41 T.C. 593 (1964). Even when uncontroverted, we may reject testimony if it is improbable, unreasonable or questionable. Demkowicz v. Commissioner,551 F.2d 929 (3d Cir. 1977), revg. T.C. Memo. 1975-278; Baird v. Commissioner,438 F.2d 490, 493 (3d Cir. 1971). This record is full of conflicting testimony. Admittedly, events 16 years in the past are hard for the parties to document and for witnesses to remember clearly. Petitioner never satisfactorily explained the source of her wealth. She suffered surprising lapses of memory, as when she denied remembering Bowen until respondent produced a postcard she sent him from Iran. She could not recall where she had worked since coming to the United States or how old her children *115 were in 1969 and 1970. Respondent's witnesses also forgot important facts.Sirlin denied having taken a mortgage from petitioner until confronted with his signature on the document. He also thought Crown had loaned petitioner $45,000, when the correct amount was $40,000. Gross could not (or would not) say why he loaned petitioner a total of $225,000 with no notes or security, other than "personal reasons." He could not reconstruct the amounts or dates of the loans. Wilkins and Bowen said Elman attended or arranged their first meetings with petitioner, but Elman adamantly denied meeting her before 1972.Elman could not recall the year he went bankrupt (1977) until his memory was refreshed. Nonetheless, he was sure he had suffered severe losses by the time he met petitioner and that these losses were caused by Keiser, not petitioner. We found Elman a highly credible witness. We accept his version of the facts where they conflict with the testimony of other witnesses. We find that Elman introduced Wilkins to Keiser, but not to petitioner. Wilkins met with Keiser and petitioner in New York, but Elman was not present. We think Wilkins testified sincerely but, blaming Elman *116 for his involvement with Keiser, he has confused the sequence of events. We do not believe Elman actually met petitioner before 1972, although we think he had heard of her before that time, through Keiser and others. Bowen, on the other hand, had an incredibly sharp memory for details. He recited the names of Swiss banks purportedly suggested by petitioner 16 years ago. He recalled exactly how much gold petitioner mentioned down to the number of bars (276), their exact weight (22 pounds each) and petitioner's asking price ($32 per ounce), as well as his potential commission ($1.00 per ounce). Bowen was supposedly negotiating for a bulk sale. This would have involved 6,072 pounds of gold. Both Bowen and Wilkins said petitioner claimed to have $6 million in gold, but the above amounts would only come to about half that amount. [20] If Bowen's interest in the numbers was intense enough to allow them to be recalled 16 years later, it is incredible that he did not perform this simple arithmetic, especially when his commission was tied directly to it. Further, he claims to have believed petitioner smuggled 6,072 pounds of gold past Customs and kept it stored in a Manhattan bank without *117 detection. For a man of Bowen's apparent sophistication, this required a gigantic leap of faith. Bowen further asks us to believe Customs offered him a $50,000 reward without any investigation, then handed him off to the Secret Service whose undercover agent heard the story from petitioner's lips but declined to follow up. The F.B.I., likewise, showed no interest. We find this sequence improbable and unreasonable, if petitioner had actually made the statements attributed to her. We believe Bowen knew petitioner, Keiser, and later Elman, but his testimony is otherwise so improbable that we disregard it. Ernesto (or Ernest) Keiser's role in this cloak and dagger plot remains a mystery. Wilkins, Bowen, and Elman agree Keiser made representations to them about gold. Wilkins and Bowen met Keiser with petitioner present. She acknowledges associating with him, purportedly breaking off when she learned of his criminal activities. *118 Wilkins and Elman gave him money, and Elman induced friends to do the same. Keiser may have invented the gold story without petitioner's knowledge to induce investors to give him money. On the other hand, petitioner may have knowingly participated in the scheme and shared the spoils. There is plenty of smoke here and there may be fire as well. The fatal flaw in respondent's case is the lack of a single witness who gave petitioner money for gold or saw anyone else do so. This is an evidentiary chasm we decline to leap. Respondent has not affirmatively proven an underpayment by clear and convincing evidence. [21]
Finally, respondent contends petitioner's high standard of living points to fraud. We disagree. Her lifestyle shows only that she had access to a lot of money. That is stipulated. It adds nothing to establish that the money came from criminal activities or any other taxable source. This case ultimately turns on the burden of proof. We are finding petitioner liable for the receipt of unreported income but not liable *119 for the fraud addition. This does not create fundamentally inconsistent judgments, since the burden of proof with respect to the deficiency lies with petitioner, while respondent bears the burden when it comes to fraud. Anastasato v. Commissioner,794 F.2d 884 (3d Cir. 1986). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. Respondent established at trial that at least three of petitioner's six children were living in 1969 and 1970 and resided with petitioner. Respondent allowed petitioner five dependency exemptions in his statutory notice, and we have been shown no reason to disturb that determination. ↩
3. Petitioner purchased the cooperative apartment in 1963 for $35,000 and it is now estimated by the parties to be worth $1.5 million. ↩
4. Respondent did not include any amounts spent for travel in petitioner's taxable income.↩
5. Respondent did not include in income amounts spent at offshore casinos, presumably because of difficulty in obtaining records. Thus, the $30,000 check to Bahamas Amusement does not represent a duplication. In her reply brief, petitioner claimed, contrary to the stipulation, that the $30,000 cashier's check was not purchased with cash but with a third-party check from Philip Reddock.Presumably, she argues that this $30,000 thus represents an additional nontaxable loan. However, no evidence on this point was presented at trial. Assertions raised solely on brief are not evidence. See discussion of Reddock loans in n. 10, infra.↩
6. See n. 13, infra.↩
7. See also Kindred v. Commissioner,T.C. Memo. 1979-457, affd. 669 F.2d 400 (6th Cir. 1982); Lane v. Commissioner,T.C. Memo. 1986-306; Asmar v. Commissioner,T.C. Memo. 1976-213; Baker v. Commissioner,T.C. Memo. 1976-93↩.
8. As noted, however, respondent has already conceded some duplications.↩
9. After his memory was refreshed the witness knowledged the correct amount was a total of $40,000. There were four notes in 1970 of $10,000, $25,000, $3,000, and $2,000. This is supported by respondent's Ex. J.↩
10. Petitioner also testified that she borrowed money from a Philip Reddock from time to time, but did not recall whether any loans were received in 1969 or 1970. However, petitioner attached to her brief a copy of an affidavit handwritten on an Internal Revenue Service form and signed, purportedly by Philip Reddock. The statement is dated November 13, 1973. Reddock stated he had known petitioner 10-12 years and had made seven unsecured and noninterest-bearing loans to her totalling $93,697.50. He said he still expects to be repaid. The affidavit does not say when these loans were made, but indicates that copies of cancelled checks and loan statements were attached to the original affidavit (but not to the copy attached to petitioner's brief). Petitioner did not call Reddock as a witness at trial. Neither did she offer the affidavit it trial. We therefore assume such evidence would have been unfavorable to her.See Kamborian v. Commissioner,56 T.C. 847, 869 (1971), affd. 469 F.2d 219↩ (1st Cir. 1972).
11. However, we are struck by the fact that the equity in petitioner's apartment could easily wipe out her liabilities. ↩
12. Of course, to the extent loans have been forgiven, petitioner would have taxable income in the year of forgiveness, unless a gift was intended. Those issues are not before us.↩
13. Neither party presented evidence regarding this item, by stipulation or otherwise. Since it was included in the income determined in the notice of deficiency, we include it for deficiency purposes but deem respondent to have waived it for purposes of proving an underpayment related to the addition to tax for fraud.↩
14. SEC. 6653. FAILURE TO PAY TAX. * * * (b) Fraud. -- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse. [The subsequent amendment of this provision by section 325(a) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 616, does not affect the instant case.] ↩
15. SEC. 7454. BURDEN OF PROOF IN FRAUD, FOUNDATION MANAGER, AND TRANSFEREE CASES. (a) Fraud. -- In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect to such issue shall be upon the Secretary.↩
16. See also Compton v. Commissioner,T.C. Memo. 1983-642↩.
17. T.C. Memo, 1970-274↩. 18. T.C. Memo, 1966-81↩.
19. He did not say whether he gave the money to Elman or Keiser. Based on the overall record, we assume it went to Keiser.↩
20. 6,072 pounds X 16 ounces per pound = 97,152 ounces at $32 per ounce = $3,108,864. We assume Bowen was not speaking of troy weight, since in that system the pound contains only 12 ounces, which would have produced a total value of only $2,331,648.↩
21. Respondent did establish petitioner received $224 interest income in 1969, but that amount alone would not create an underpayment of tax.↩